[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nicole was born on September 14, 1989. Her brother John was born on May 10, 1991. By petitions filed coterminously on June 12, 1991, the Department of Children and Youth Services (DCYS) alleges that John was a neglected child under Gen. Stat. Sec. 46b-120 and seeks to terminate the parental rights of Stephanie (mother) and John, Sr. (father) under Sec. 45a-717 by Sec. 17a-112(e). John, Sr. acknowledged he was the father of the boy and was so found. On that same filing date DCYS also entered a petition alleging that Nicole was neglected and uncared for under Sec. 46b-120. Although a father, not John, Sr., was listed, that person was deleted from the petition; the father of Nicole is unknown.
Both children have been in the custody of DCYS from about June 12, 1991 under an Order of Temporary Custody under Sec. 46b-129(b).
By agreement, the single petition involving Nicole was withdrawn and co-terminous petitions were filed on November 20, 1991 alleging neglect and uncared for under Sec. 46b-120
CT Page 5863 and seeking termination of the mother's parental rights under Sec. 45a-717 by Sec. 17a-112(e); the Order of Temporary Custody remained in effect.
On January 21, 1992, DCYS amended to add an uncared for ground for Nicole and to include uncared for grounds for John. In a separate amendment DCYS expanded its summary of facts.
Counsel were appointed for each parent and the children. Evaluations were ordered. Continuances were requested usually by a parent and an extensive trial has been held extending intermittedly over several days.
Coterminous petitions are separate and distinct petitions with their own specific requirements.
In re Juvenile Appeal (84-AB), 192 Conn. 254,471 A.2d 1380 (1984). By agreement on January 27, 1992, the mother admitted that the children were neglected and uncared for and the father admitted that his son was neglected and uncared for. The court next addressed the termination petition for possible disposition. DCYS withdrew two allegations. The mother admitted the remaining grounds (acts of commission or omission) concerning both children as did the father regarding his son.
The parents, however, object to termination as disposition but do propose commitment of both children to DCYS as the appropriate resolution under Sec. 46b-129. The sole contested issue for the court, therefore, is dispositional based on the best interest of the children on a termination clear and convincing standard of proof through the hearings. Compare, Seymour v. Seymour, 180 Conn. 705, 433 A.2d 1005 (1980).
The court finds for the petitioner and terminates the parental rights of these parents in the two children.
 I.
In determining whether to terminate parental rights, the court must consider and make six written findings. Sec.45a-717(h). The following recital of the facts includes those findings. The court has considered the testimony, exhibits and arguments.
 a.
The mother was born in 1971 and has an extensive history with DCYS including various childhood placements. In her teens she was hospitalized for depression and eventually placed CT Page 5864 at Klingberg Family Center. The mother has limited intellectual capacity although she claims to have completed ninth grade in special education. She can not count or tell time and is not good at reading or writing. Independent since fourteen, she had begun to cohabitate with father in May 1989, some four months before the seventeen year old mother gave birth to Nicole. The mother continued to use alcohol and cocaine during this pregnancy and tested positive at birth, although the baby was negative. During the fourth month of pregnancy she was admitted to the hospital after a seven day cocaine binge; the fetus was at risk.
In August 1991 the University of Connecticut Health Center reported that Nicole at twenty one months had a growth deficiency which did not then fit the classical description of FAS. The Center cautioned about possible fetal alcohol effects. While requesting a follow-up evaluation in two years, the Center recommended a stable environment and a constant care giver to provide physical care and adequate stimulation for Nichole. Exhibits S-1, S-3. At birth of John, the mother tested positive for cocaine, having used drugs and alcohol during the pregnancy.
While the mother concedes she still has problems and can't care for her children now, she denies current drug or alcohol use. She has a spotty attendance record at AA. The mother was in the Blue Hills rehabilitation program from October 30, to December 9, 1991. Blue Hills recommended a three to six month aftercare program. As of January 7, 1992 she was not in AA and has attended eleven meetings by February 21, 1992. She wants to return to school. She admits she has not taken advantage of services offered to her since 1989. The mother admits she has been dependent on others but postulates that she is now independent. The mother has no income and has lived in seven different places and now resides with a former client of the Blue Hills Clinic. The mother, in effect, requests that the children be held in limbo so she can demonstrate her success in overcoming her past failings.
 b.
The father was born in 1965. He has approximately thirteen siblings but no relationship with any. Although he enlisted in the Army for three years, he was discharged in August 1985, after one year for testing positive for marijuana. He has had an alcohol problem since 1982 and drug problems since 1985. He discontinued marijuana in 1989 but shifted to cocaine in 1990. The father was admitted to Cedarcrest for about six months and then to Norwich hospital in 1987 for approximately six months after one of several suicide attempts and then in CT Page 5865 1987 to a Salvation Army ninety day alcoholic rehabilitation program. He either quit this program after forty-five days for employment to support his drinking expenses or was discharged for drinking. His initial hospitalization at Cedarcrest and Norwich may not have related to substance abuse. He was treated by chemotherapy, but may no longer take medication. By the fall of 1987, he entered Manchester Hospital for two to four weeks inpatient followed by a few months outpatient. He then entered Cedarcrest for about eleven days. He may have resumed his medication. From February 1988 to July 1988, he was in jail. Upon release he was assigned to a half-way house where he experienced some difficulties. He moved to Terryville where he resumed heavy drinking in late January 1989. The father denies his history reveals a revolving door pattern.
Both parents were arrested in August 1991. The father has been incarcerated since August 1991. His estimated release date is July 21, 1992 but his stay may be shortened for good time credit. He attends AA sessions in jail. Upon release he I would live with his mother before establishing his own home. He believes he can overcome his personal problems, return to school and claims he can easily obtain employment. He denies he was offered services.
Prior to his relationship with the mother, the father lived with another woman producing a child. The father has no contact with that child.
 c.
DCYS first became aware of this family in December 1989. Although the mother denied drug use she enrolled in the spring of 1991 in a drug program at Wheeler Clinic. She missed Wheeler sessions as she missed counselling sessions at the shelter. "Too busy." Prior to the April 15, 1991 service contract, Exhibit S-7, the mother had been offered two separate service programs. DCYS discussed family violence with her. On June 10, 1991 when John, Jr. was taken to the hospital, DCYS was at the house to introduce the Klingberg worker. DCYS enlisted the services of the Visiting Nurses Association who visited twice. Both parents failed to attend the first psychological evaluation; the mother failing to cooperate with arrangements.
Because of the relationship between the parents, there have been community referral for services. The mother first became a child protection team case in July 1989. The team coordinator visited the home in May 1991, to find Nicole with a diaper rash so serious as to be bleeding. Without any diaper Nicole urinated at whim and played in a puddle of urine. CT Page 5866 Exhibit S-13. A parent aide became involved in September 1989 after referral of mother to a shelter for battered women. When the family declined services the file was closed two months later. At that time there were no medical concerns regarding Nicole. The file was reopened in September 1990. Nicole had stopped gaining weight. The mother and Nicole ate lunch daily at the Salvation Army soup kitchen. The suggestion of drug rehabilitation was ignored; the mother denied drug use. Although afraid of physical and verbal abuse, the mother never did return to any shelter. The family was five months behind in rent and water bills. The father seemed particularly fearful of his neighbors. The services of the aide ended on May 16, 1991. The aide concluded that there was only a minimal growth in parenting ability. Exhibit S-11. Both the coordinator and aide believed the children were in imminent danger.
Pursuant to an Order of Temporary Custody both children were placed in foster care on June 12, 1991. The allegations were serious physical illness and immediate physical danger. John, Jr. had been brought on June 10 to the child's pediatrician by the DCYS worker who had become alarmed at his condition on a home visit. The baby was cyanotic with evidence of severe hypoglycemia. The child was immediately hospitalized for intensive care. The child's life was in imminent danger.
While admitting that Nichole had a prior eating problem, the parents distinguish between the two children: Nicole would spit out food and John, Jr. refused to accept the food. The parents were unable to understand that, whatever the manifestation, the basic concern was a failure to receive adequate nourishment.
The doctor had been so concerned about John's condition on May 31, 1991 that he filed a report of suspected child abuse with DCYS. The mother had missed a two week appointment and would have passed the May 30 date except for DCYS. She failed to return on May 31 with the PKU test. There had been concerns about Nicole's slow growth patterns suggesting nutritional insufficiency and fetal alcohol syndrome (FAS). Exhibit S-3. DCYS and the mother had signed a service agreement to govern the mother's behavior between April 15 and July 15, 1991. Exhibit S-7. There was a family referral to the Klingberg Family Center on June 10, 1991. Klingberg closed its referral on issuance of the Order of Taken Into Custody. The mother had failed to keep an appointment for Nicole in March 1991 with a nutritionist. At twenty months Nicole weighed seventeen pounds, seven ounces. About three weeks later on May 31, Nicole weighed only eighteen pounds, one ounce; at that time the child was dirty, unkept and had a few small purple discolorations on both cheeks. CT Page 5867
On July 8, 1991, the parents entered Bristol Hospital for a ten day drug evaluation. The next day father was discharged and mother withdrew against advice. The hospital refused readmission because the parents were aware of their options. The father may have attempted suicide on July 10th and returned to a hospital. The mother's residence was unknown for about one month from July 16, 1991.
From placement in foster care to January 7, 1992, there were six visits by the mother and three visits with the father. At visits the mother has not been particularly interested in John, Jr. John, Jr. has done well in placement, gaining weight and thriving. He is being monitored to ensure appropriate maturation.
Services provided to the parent and child were timely appropriate and sufficient to facilitate reunion of child and parent. There were no court orders entered in this matter although the parties initially failed to comply with an order of psychological evaluation. Although comfortable with his mother, John seems to have no special feelings or emotional ties to his parents but is responsive to the foster mother. Nicole is happy to see her mother but separates effortlessly; the interaction between mother and daughter is poor. The father tends to rough house with Nicole. The parents have not adjusted their circumstance, conduct or conditions to make it in the best interest of the children to return them home in the foreseeable future. There has been insufficient contact between parents and child and the foster parent. There has been no unreasonable act or conduct by anyone that prevented the parent from a meaningful relationship with the child. While these parents have had financial problems, their economic circumstance was not a significant factor in their present plight; children can have a healthy and safe relationship with impecunious parents.
 d.
Dr. Freedman, a clinical psychologist, evaluated the two children on July 26, 1991. The foster mother participated. He found that both children have specialized needs and he recommended termination. Dr. Freedman did evaluate the children and the parents on September 30, 1991. The mother failed to show understanding or motivation for change. She had rejected a recommendation for Community Health Services a week earlier to seek outpatient services; she wanted inpatient treatment. She was still loyal to the father, as demonstrated during the trial. At the evaluation, the mothers interaction with Nicole was poor and the father seemed uncertain with Nicole and his his son. The father was action orientated and with little CT Page 5868 insight or understanding of his problems he has a poor prognosis for rehabilitation. The parents showed no parenting ability.
Both parents showed evidence of long standing personality disorders and substance abuse. The father is ambivalent regarding his substance abuse problem. Without intensive treatment of doubtful benefit, the mother will likely be a neglectful, overwhelmed mother. Exhibits S-9 and S-10. The parents need intensive rehabilitation with intensive personal counselling. Because the chances of rehabilitation are not good, the children should not wait on an unlikely chance of success. The psychologist recommended termination of parental rights.
Testimony from mental health professionals is accorded great weight. In re Nicoline T., 9 Conn. App. 598, 605,520 A.2d 639 (1987).
The attorney for the child supports the termination of parental rights.
 II.
By agreement of the mother of both children and the father of John, Jr. as of the date of the petition/amendment, both children were neglected in that (1) they were denied proper care and attention, physically, educationally, emotionally or morally and (2) they were permitted to live under conditions, circumstances or associations injurious to their well-being and further both children were uncared for in that (1) they were homeless and (2) their home could not provide the specialized care which their physical, emotional or mental conditions required. Sec. 46b-129. By additional agreement of the mother of both children and the father of John, as of the date of the petition/amendment, both children had been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for their physical, educational, moral or emotional well-being. Sec. 45a-717f.
Whatever the diagnosis of the parents, the court must resolve the issue on the basis of the actual behavior of these parents and the specific needs of these children. The review is functional, not philosophical. The court finds by clear and convincing evidence that termination of parental rights is in the best interest of each child.
While the conditions relating to Nicole may have existed for not less than one year, the court waives for both children the requirement that one year expire prior to termination of parental rights as it finds from the totality of the circumstances surrounding each child that such a waiver is CT Page 5869 necessary to promote the best interest of the child. Sec.45a-717(g). In re Christine F., 6 Conn. App. 360, 371-372,505 A.2d 734 (1986).
The court finds that reasonable efforts were made prior to placement to prevent or eliminate the need to remove the children from the home and reasonable efforts were made to make it possible for the children to return home. Continuation in the home is contrary to the welfare of the children.
 III.
Each petition to terminate parental rights in these two children is granted.
The Commissioner of DCYS is appointed statutory parent of each child and shall report within ninety days on a case plan; at least every six months a report by the statutory parent shall be made to the court on the implementation of the plan. A treatment plan/administrative review for each child shall be filed within six months of this date. The case report and treatment plan/administrative review may by the same document. There shall be a court review no less than once a year. Cf. Sec. 17a-112(1).
Samuel S. Goldstein Judge, Superior Court