DENNIS SEYMOUR *v.* MARGARET SEYMOUR

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued March 11—decision released May 20, 1980

*Gary I. Cohen*, for the appellant (plaintiff).

*Mary Ellen Wynn*, for the appellee (defendant).

*Peter A. Kelly*, for the minor child.

PETERS, J.  This is an appeal from a judgment awarding the custody of a minor child to her mother. The plaintiff, Dennis Seymour, brought an action against the defendant, Margaret Seymour, seeking dissolution of their marriage and custody of their minor child.  The defendant's cross complaint did not contest that the marriage had irretrievably broken down, but sought an order that custody be awarded to the defendant as well as an order for ancillary financial relief.  No appeal has been taken from the trial court's judgment insofar as it dissolved the parties' marriage and divided their joint assets.  The parties continue to be at issue about the custody of their child, which the trial court, *Berdon, J.*, awarded to the defendant mother.

The trial court's extensive finding, corrected as appropriate,[1] establishes the following facts:  The plaintiff (hereinafter the father) and the defendant (hereinafter the mother) were married in 1972. Their only child was born on February 4, 1975.  The child's first year was a difficult one for her and therefore for her parents.  She suffered from colic and from a hip problem that required the wearing of an orthopedic brace.  As a result, the child cried often and slept irregularly.  During this first year, the mother had primary responsibility for the care

[1] The appellant's effort to add fifty-two proposed draft findings, many of which are merely duplicative of findings actually made, is, as we have noted in the past, a singularly unhelpful approach to appellate review.  See *Fucci* v. *Fucci*, 179 Conn. 174, 177, 425 A.2d 592 (1979).

of the child, in part because she was nursing her and in part because the father, with a full time job outside of the home, was reluctant to assist in her care. Except for the assistance of friends, there was little outside help for the mother at this time. Within a year of the child's birth, the parents had separated.

The parties' living arrangements, and their arrangements for the care of their child, took various forms from the time of separation in January, 1976, to the time of trial, which began in July, 1977. In 1976, the mother and the child first lived in a variety of marginally adequate temporary quarters. In an effort to find more suitable quarters and to make more permanent plans, the mother, in May of that year, found a baby-sitter for the child during weekdays and asked the father to care for her at night. The father remained in sole custody of the child until some time in June, when the mother resumed personal responsibility for the care of the child for part of each week. The father's custody continued to include leaving the child on weekdays with the baby-sitter the mother had located. The mother's custody did not require the use of baby-sitters, since the mother was able to schedule her part-time work for the time when the child was with her father. Although both parents tried, in good faith, to make a success of joint custody, both had become persuaded, by the time of trial, that joint custody was not feasible.

Although all aspects of the issue of custody of the minor child, then two and one-half years old, were thoroughly and extensively contested at trial by all of the interested parties, there was wide-

spread agreement on two crucial matters. Witness after witness testified that both the mother and the father were suitable and nurturing parents, that each loved the child, and that the child had significant psychological ties to each of them. The witnesses were equally in agreement that the two parents exhibited marked and irreconcilable differences in their personalities, in their life-styles, and in their child care practices. The father was characterized as orderly, well organized, responsible and inflexible, while the mother was described as energetic, impulsive, immature and open. These disparities in the parents' personal orientations led to opposing viewpoints with respect to the child's diet, health care and daily living arrangements, and hence to the breakdown of joint custody of the child.

To assist the court in its Solomonic responsibility to make a choice between the child's suitable but irreconcilable parents, the court appointed Attorney Peter A. Kelly as counsel for the minor child and conducted extensive hearings for seven trial days. The court received testimony not only from the parents and their friends but also from a number of professional experts. The court heard from Kay Shafer, a psychiatric social worker who had counseled extensively with the parents before and after the marital breakdown; she recommended that custody be awarded to the father. The court asked for a report from a family relations officer, Allen Rubin, who, after a custody investigation, also recommended that custody be awarded to the father. The court received reports, finally, from two psychiatrists. Earl S. Patterson, M.D., concluded from his psychiatric examination of the parents that psychiatrically it made no difference which parent was awarded custody. Kyle D. Pruett, M.D., finding that

the child's primary psychological attachment was to her mother, recommended that custody be awarded to the mother.

The court concluded, in accordance with the criteria of General Statutes § 46b-56 (b),[2] that custody should be awarded to the mother because such an award would be in the best interests of the minor child. The appellants cannot and do not challenge the overall propriety of this standard, which this court has on innumerable occasions repeatedly affirmed. *Friedman* v. *Friedman,* 180 Conn. 132, 135–36, 429 A.2d 823 (1980); *Trunik* v. *Trunik,* 179 Conn. 287, 426 A.2d 274 (1979); *Joy* v. *Joy,* 178 Conn. 254, 257, 423 A.2d 895 (1979); *Stewart* v. *Stewart,* 177 Conn. 401, 408, 418 A.2d 62 (1979); *Spicer* v. *Spicer,* 173 Conn. 161, 162, 377 A.2d 259 (1977); *Simons* v. *Simons,* 172 Conn. 341, 347, 374 A.2d 1040 (1977). "It is settled that the determination of the custody of a minor child rests largely in the discretion of the trial court, and its decision cannot be overriden unless it abused its discretion." *Simons* v. *Simons,* supra, 348.

The appellants mount a twofold attack on the trial court's determination to award custody to the mother. First, the appellants argue that the custody statute's failure to provide guidelines for the exercise of the trial court's discretion makes the statute unconstitutionally vague. Second, the appellants

[2] Section 46b-56 provides, in relevant part: "SUPERIOR COURT ORDERS RE CUSTODY AND CARE OF MINOR CHILDREN IN ACTIONS FOR DISSOLUTION OF MARRIAGE, LEGAL SEPARATION AND ANNULMENT. . . . (b) In making or modifying any order with respect to custody or visitation, the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if he is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of the marriage or legal separation."

contend that the trial court abused its discretion in relying too heavily on psychiatric testimony about the child's primary psychological parent. We find neither argument persuasive.

This is not the first occasion upon which this court has been asked to interpolate objective guidelines into the open-ended fact-oriented statutes which govern family disputes. In *Joy* v. *Joy,* 178 Conn. 254, 255, 423 A.2d 895 (1979), we declined to impose guidelines to constrain a trial court's inquiry into the irretrievable breakdown of a marriage. In *Posada* v. *Posada,* 179 Conn. 568, 573, 427 A.2d 406 (1980), and *Fucci* v. *Fucci,* 179 Conn. 174, 179–80, 425 A.2d 592 (1979), we refused to require specific findings concerning each of the factors that a trial court must consider in making financial settlements pursuant to General Statutes §§ 46b-81 (assignment of property) and 46b-82 (alimony). We continue to adhere to the view that the legislature was acting wisely in leaving the delicate and difficult process of fact-finding in family matters to flexible, individualized adjudication of the particular facts of each case without the constraint of objective guidelines. See Mnookin, "Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy," 39 Law & Contemp. Prob. 226, 249–68 (Summer, 1975); Foster & Freed, "Child Custody," 39 N.Y.U. L. Rev. 423, 441 (1964). Certainly, a statute that vests discretion in the trial court to determine the best interests of a child in awarding custody is no more unconstitutional than is a statute that allows dissolution of a marriage without fault upon a factual finding that a marriage has irretrievably broken down. See *Joy* v. *Joy,* supra, 255, and cases there cited.

The contention that the trial court abused its discretion is based upon the appellants' allegation that insufficient weight was given to evidence concerning the parenting ability of the father and of the mother, and excessive weight was given to identification of the child's primary psychological parent. This claim is difficult to sustain in light of the trial court's express statement that it had taken into account the parents' past behavior as it related to their parenting ability and to their consistency in parenting and life style, insofar as these factors might affect the child's growth, development and well-being. It is true that the court assigned special significance to four additional factors: the emotional ties of the child to each parent; the emotional ties of each parent to the child; the time each parent would be able to devote to the child on a day-to-day basis; and the flexibility of each parent to best serve the psychological development and growth of the child. Even these factors, however, go beyond the single-minded attention to primary attachment to a psychological parent of which the appellants are critical.

The role that psychological evaluations play in the determination of the best interests of the child is not susceptible to generalization by appellate courts. It is significant that Goldstein, Freud & Solnit characterize as the "least detrimental available alternative" their suggestion that child placement should maintain "on a continuous, unconditional, and permanent basis a relationship with at least one adult who is or will become the child's psychological parent." Goldstein, Freud & Solnit, Beyond the Best Interests of the Child, p. 99 (1979). Such a characterization serves to emphasize that the concept of the psychological parent is not a fixed

star by which custody decisions can invariably be guided. The notion of a person being or becoming a psychological parent properly emphasizes that nature and nurture both play a role in a child's psychological well-being. Nothing in Beyond the Best Interests of the Child is inconsistent with a child's having two psychological parents, as would normally be the case in an intact family. Furthermore, professionals in the field of child development remind us that a child may become deeply attached to a parent who is seriously inadequate, disturbed or abusive, so that "in some cases it is a disadvantage for the child to be in the care of the psychological parent." Leonard & Provence, "The Development of Parent-Child Relationships and the Psychological Parent," 53 Conn. B.J. 320, 327 (1979). While psychological parenting is thus one indicator of the best interests of a child, a court has an independent responsibility to assure itself of the suitability of the parent to whom the child is primarily attached. Cf. *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 667–68, 420 A.2d 875 (1979). On this record, the trial court exercised that responsibility.

The appellants challenge not only the concept of the psychological parent but also the methodology of the psychiatrist who presented the concept to the court. The weight to be given to psychological testimony by professionals in mental health is, in matters of custody, as it is elsewhere, a question for the trier of fact. It should be noted, however, that expert opinion must be evaluated in light of the expert's opportunity to come to a reasoned conclusion. *Duley* v. *Plourde,* 170 Conn. 482, 487, 365 A.2d 1148 (1976); *Stephanofsky* v. *Hill,* 136 Conn. 379, 384, 71 A.2d 560 (1950); see Tait and LaPlante,

Handbook of Connecticut Evidence § 7.16 (b) (1976). As this case illustrates, long-range forecasts about future child development are sometimes based upon relatively few and brief interviews and tests conducted under circumstances of stress.[3] It is not clear to what extent the analytic insights derived from long and intensive psychotherapy can readily be translated into an evaluative setting that is governed by a radically different time frame. None of these infirmities in the psychological testimony is, however, sufficient, singly or jointly, to have required exclusion of Pruett's testimony.

In the circumstances of the case before it, the trial court was certainly not unjustified in concluding that it was relevant to inquire as it did into the psychological relationship between the child and her parents. Once it is definitively established, as it was here, that each parent is loving, caring and otherwise entirely suitable, the court perforce must look to other factors to come to a decision about custody. The court was not in error in basing its award of custody to the mother on her strong and healthy relationship to her daughter, her willingness and ability to devote time to her daughter, and her willingness to facilitate visitation by the father.

There is no error.

In this opinion the other judges concurred.

---

[3] Pruett saw the child with her father on two occasions, and with her mother once. Each interview lasted between forty-five and fifty minutes. Pruett never saw the child in the company of both of her parents. Pruett supervised the administration of a development assessment for the child alone, which involved both interviews and observations of undisclosed length.