MEMORANDUM OF DECISION
On April 29, 1999, the Department of Children and Families ("DCF"), filed a petition to terminate the parental rights of A. D., respondent-mother, to her child, Kayla D. On January 26, 27, and 28, 2000, trial concerning the petition occurred in this court. For the reasons stated below, the court grants the petition.
FACTS
CT Page 1846
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
Kayla D. was born on January 9, 1990. A. D. left Kayla with her friend D. G., and D. G.'s family at the end August, 1997. Neglect petitions were filed in her interest and that of her sibling, K., on October 6, 1997. Although originally left with D. G., K. was placed in his father's care. Kayla's father is unknown. She has a stepfather, W. F., a non-party to this proceeding, from whom her mother was divorced. After a nolo contendere plea by A. D. on March 11, 1998, the Superior Court for Juvenile Matters adjudicated Kayla as neglected, ordered Kayla's commitment to DCF for a period not to exceed twelve months and ordered expectations (see 10, infra) for A. D.[2]
On March 10, 1999, by clear and convincing evidence, the court found that reasonable efforts had been made to make it possible for Kayla to return home and ruled that continuing efforts to reunify Kayla with her mother were not appropriate. Her commitment was extended until March 11, 2000.[3]
Kayla has remained in the care of D. G. and A. G., her husband, since A. D. left her with them in August, 1997. As of trial, she had resided with them for approximately two years and five months.
The termination petition ("petition") alleged two grounds for termination of A. D.'s parental rights: abandonment and failure to rehabilitate. At trial, A. D. appeared and was represented by counsel.
B. The Mother
A. D. was born in New Britain in 1964. Her mother has visited Kayla frequently at D. G.'s home. A. D. witnessed domestic violence in her home at age seven. She did not complete high school. In 1990, she married W. F.; they were divorced in 1993 or 1995.[4] Previously, she had a long-term relationship with another man, which resulted in the birth of Kayla's sibling, K.
A. D.'s health history includes several surgeries for stomach and bowel problems, including a colostomy, a reversal of the CT Page 1847 colostomy, and an ileostomy. She had reconstructive bowel surgery in the summer of 1997. During a judicial pre-trial in February, 1998 she had a seizure in a court waiting room; she left by ambulance.
A. D. has a long-standing alcohol abuse history. A March, 1997 Bristol Hospital discharge summary, Exh. 8 at 1, reflects prior alcoholism and that "[s]he has been drinking up to one-half gallon of vodka daily." After trying to stop such intake, she had a seizure, and was brought by ambulance to the hospital. She hallucinated during her hospital stay. Id. at 2. She went into detoxification at the hospital, resulting in a DCF referral. Family Treatment Plan, dated June 23, 1997, Exh. 22 at 2. Kayla began attending group therapy at the Wheeler Clinic ("Wheeler"). Id. At that juncture, A. D. did not think it was a problem that she, as a recovering alcoholic, was living with a boyfriend who was drinking. Id.
Wendy Bonola, a DCF investigative social worker, received the referral on April 3, 1997. She met Kayla at school after being unable to contact A. D. She also met J. L., A. D.'s then-live-in. boyfriend. Kayla reported that she saw W. F., who she then thought was her father, on week-ends. Kayla reported an incident three years earlier where W. F. had pushed A. D. down the stairs, causing A. D. to get a black-eye. Kayla said her mother was sleeping a lot, and had an alcohol problem. Kayla got herself up at 5:30 a.m. every day. She described being alone when her mother would pass out on the couch.
Ms. Bonola spoke to A. D., who confirmed she was depressed and had an alcohol problem. A. D. discussed an incident which occurred with W. F. which resulted in her going to the hospital. She agreed that Kayla observed this incident. J. L. told Ms. Bonola that he became intoxicated two or three times a week.
On April 10, 1997, a Service Agreement was entered into between DCF and A. D. (Exh. 2), in which A. D. agreed to: (1) consistently attend the Bristol Counseling Center (of Bristol Hospital) for treatment and individual counseling; (2) obtain individual counseling for both children; (3) cease all alcohol consumption; and (4) protect the children at all times.
In May, 1997, her pre-admission history form at Bristol Hospital's Counseling Center, Exh. 7, reflected her resumed alcohol use in March, 1997 after a period of sobriety. Id. at 2. CT Page 1848 This report reflected a history of alcohol-related symptoms, including vomiting, stomach pain, tremulousness, and passing out. A. D. reported that she did not have "a lot of friends," and that she had "one sober friend." Id. She rated herself as a person who engaged in alcohol abuse ("[m]oderate impairment chronic, recurrent misuse). Id. at 4. She reported moderate impairment of her family relationships moods/emotional reactions, and her medical/physical health due to substance abuse. Id. at 5. Alcohol was said to irritate her ileostomy. Id. Her treatment plan included remaining sober. building a supportive network and obtaining a psychological evaluation and recommendations. Id. at 6. She was found to need the DSM-IV criteria for substance use disorder. Id. at 7. She then attended an intensive out-patient counseling program at the Counseling Center, which she completed. Next she attended a one-night per week out-patient program until she relapsed in August, 1997.
In May, 1997, Ms. Duncan, a DCF social worker, was assigned to the family's case. At a home visit, A. D. informed Ms. Duncan that she was involved in family therapy at Wheeler with Ms. Assard-Wu, Kayla's therapist. In fact, they had attended one session only as a family. At the time, A. D. was living with her boyfriend, J. L., and the children, but was thinking of moving out with the children. Ms. Duncan referred her to services in Bristol for housing assistance.
In June, 1997, A. D. expressed that she would soon be hospitalized to correct a colostomy. She did not trust J. L. with child care. In July, A. D. remained unsure of her relationship with J. L.
In mid-September, 1997, Ms. Duncan received a new referral concerning Kayla from D. G., A. D.'s friend. In August, A. D. and the children had moved in with D. G. and all remained there for a couple of weeks. Around August 30, A. D. had left with J. L., leaving the children with D. G. Kayla did not want to go since A. D. was drunk. D. G. thought that Kayla should not go. D. G. conferred with Keith's father, with W. F. (Kayla's stepfather), and A. D.'s mother; all agreed that it would be best for the children to stay with D. G. and her family.
Her history at the Counseling Center also provides insight into what occurred during this period. Her discharge summary (Exh. 5) contains a discharge date of September 30, 1997, but reflects a last visit date of August 5, 1997. Her diagnosis was alcohol CT Page 1849 dependence at admission and discharge. Id. at 1. At 2, the summary noted that she had done well in phase 1, and was doing well in phase 2 until she stopped treatment and medications in mid-August. Several attempts by personnel at the Center to communicate with her by phone and letter were unsuccessful. It was noted that she had had abdominal surgery in July, 1997. Id. at 3. A. D. was terminated from the program due on non-compliance. Id. Her prognosis was listed as "guarded." Id. at 4. An eight month gap in A. D.'s treatment then ensued.
Mr. Duncan visited D. G.'s home in response to the referral. Kayla told her that A. D. had passed out while caring for her. She also related that A. D. was pregnant and she had told Kayla that the baby would die due to a scar on A. D.'s stomach. Also, according to Kayla, J. L. had threatened to kill K.'s father. Kayla felt she would receive better care with D. G. and her family.
DCF's Family Treatment Plan, dated December 23, 1997 (Exh. 23) noted as family weaknesses A. D.'s chronic alcoholism, serious medical issues, and "live-in boyfriend who is still drinking and is resistant to treatment." Id. at 2.
A. D. testified at trial. Her primary goal at trial was to establish that W. F. should become Kayla's adoptive parent. She described him as Kayla's "Daddy" and as a devoted father, who has remained in contact with Kayla since his separation and divorce from A. D.
She informed the court that she is not asking the court for custody of Kayla for herself. She does not dispute that she cannot take care of Kayla, due to her medical condition and finances. Instead, she stated that she would agree to the termination of her parental rights if W. F. adopted Kayla. In contrast, if D. G. and A. G. adopt Kayla, she is concerned that she and her family will not have contact with Kayla. She stated she would be satisfied with continuing visitation.
Since June of 1999, she has been treated at the Institute of Living's dual diagnosis program but will have to discontinue this due to her insurance benefits running out. Currently, she is living with K.'s father. When asked what would prevent her from living with W. F. again, after his adoption of Kayla (if that occurred), she simply stated that she did not want to do so and that, since he lives in Terryville, it would be too far from CT Page 1850 where her medical care is located in Hartford. The court does not credit these responses. On cross-examination, when questioned about a domestic incident between her and W. F. when they were married, she was asked if she told responding EMTs that her husband had hit her in the face. She responded that she was drinking at the time and if she said so it was not true. As stated below, at 19-20, Dr. Meier, the court-appointed evaluator, found that A. D. was experiencing significant emotional distress and confused thinking.
C. The Father
A. D. never identified Kayla's biological father. She claims she was raped and Kayla's birth resulted. She married W. F. and Kayla believed he was her biological father for several years.
D. Kayla and Her Progress In Foster Care
Kayla is an intelligent, sensitive, pretty child. Ongoing Individual Treatment Plan, dated February 4, 1999, Exh. 19, at 4. When Kayla attended first grade she was placed in a reading recovery program due to lack of readiness skills. Now, according to her foster mother, D. G., she is doing "great" in school. Transcript of D. G.'s testimony, January 27, 2000, at 1 ("D. G. Tr. at ___").
According to the April 11, 1998 treatment plan, Exh. 17 at 2, Kayla understood that "her mother is sick and cannot take care of her." She was very happy with D. G.'s family "where she is well cared for." Id.
Even before she was placed, Kayla attended group therapy at Wheeler for children of substance abusing parents. While in D. G.'s and A. G.'s care, she has continued therapy with the same therapist, Jessica Assard-Wu. Within the group she has flourished and become confident.
She has thrived in D. G.'s and A. G.'s home. Her mother and D. G. had become friends through their daughters, who are the same age and attended the same school. D. G. had known A. D. for a year and a half by the summer of 1997. D. G. described that A. D. "wanted to get out, away from her boyfriend, he was kind of abusive and I told her she could live with me and I would help her get on her feet. She was going through some hard times. . . ." D. G. Tr. at 5. Kayla was not placed with W. F. in CT Page 1851 1997 because everyone agreed, including W. F., that it would be better for her to be with D. G. and A. G. Officially, D. G. and A. G. became Kayla's foster parents on March 11, 1998, at the time of the neglect adjudication.
Kayla remains best friends with T., their oldest daughter. She and T. are "inseparable." D. G. Tr. at 2. Kayla is in a stable, nurturing environment. She feels content and safe there. She receives attention and structure. She is regularly involved in extracurricular activities, including dance lessons, bowling, and Brownies.
Kayla confides in D. G. concerning her anxieties about returning to her mother's care. She is bonded to her foster parents and feels part of their family. After recent visits with her mother, Kayla becomes very quiet, tends to go alone in her room, and involves herself in something where she is not with the other children (besides T., D. G. has another daughter, age four).
Kayla also has a close, on-going relationship with W. F., her stepfather. She has daily phone contact with him. D. G. Tr. at 5. Prior to his suffering a serious stroke in June, 1999, Kayla visited him regularly on week-ends at his home in Terryville. Almost every time her best friend. T. accompanied her. He took Kayla to therapy and dance classes. She is also bonded to him. Prior to the stroke, Kayla stated that she would like to be adopted by him and he strongly expressed his interest in doing so.
Kayla's Ongoing Individual Treatment Plan, dated January 5, 1999. Exh. 19, at 7, reflects the "possible goal of adoption by [W. F.], who Kayla calls `daddy' and who she thinks of as her father."
Ms. Duncan reported an incident in the past when Kayla said she had been scared when in the same bed with W. F. This was discussed and Kayla was provided with a separate room when at his home. Ms. Assard-Wu believes that Kayla can manipulate W. F. to get what she wants. Family therapy was recommended for W. F. if he adopted Kayla. The subsequent plan, dated July 12, 1999, reflects the then-recently suffered stroke and states "it is unknown if he will be able to care for Kayla." Exh. 20 at 3. The most recent plan, dated December 3, 1999, Exh. 21, states that W. F. "will not be able to adopt Kayla," apparently due to the CT Page 1852 stroke. Id. at 7.
W. F. currently is not able to use his right arm and wears a brace on one leg. D. G. Tr. at 2. One of his daughters (with her daughter and son, who are ages fifteen and twelve) has moved into his home to assist him. Id. at 5-6. Since his stroke, Kayla has not been in his presence alone at his residence; one or the other of his daughters has to be present. Id. at 8. In case he fell or needed assistance Kayla would not be able to do that. Id. at 9. D. G. picks W. F. up every Thursday so that he can observe Kayla at her dance class. Id. at 9. He also was at D. G.'s house for Thanksgiving and Kayla's birthday. Id.
Prior to the stroke, D. G., A. G., and W. F. discussed the adoption question. They agreed that, if W. F. could adopt Kayla, he would. If he could not, D. G. and A. G. would do so. Id. at 10. After the stroke, D. G. and A. G. again stepped forward for Kayla. They would like to adopt her.
Kayla has told D. G. that since "she knows [W. F.] can't take care of her like before, she would love to stay with me if possible." Id. at 6. D. G. would like to see Kayla retain her relationship with W. F. Id.
D. G.'s relationship with A. D. is now very strained and marked by distrust. Id. Nevertheless, to her credit, D. G. is willing, after adopting Kayla (if that occurs), to allow Kayla to have contact in the future with A. D. if (1) Kayla wants to do so; (2) A. D. stays sober; and (3) visits were supervised. She stated, "I'm a mother myself and I strongly believe that mothers should have some contact with their children." Id. at 7.
D. G. plans also to continue Kayla's participation in therapy since "it does her well to openly talk with somebody that isn't right in the midst of everything, she's a little more comfortable." Id. at 8.
E. Efforts at Rehabilitation and Reunification
On March 11, 1998, when Kayla was adjudicated as a neglected child by the Superior Court, reasonable Expectations of the Court ("Expectations") were signed by A. D, by her then-attorney. and entered by the court. Exh. 1. The court's Notice to Parents stated, in pertinent part, that "Failure to achieve these goals will increase the chance that a petition may be filed to CT Page 1853 terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCF worker." Id. The Expectations included: (1) keep all appointments set by or with DCF; (2) visit the child as often as DCF permits; (3) participate in counseling, including parenting, individual, and family as Kayla's therapist recommends, and drug/alcohol (in-patient and out-patient); (4) secure/maintain adequate housing and income; (5) no substance abuse; (6) no involvement with criminal justice system.
Appointments/Whereabouts
As to keeping appointments and her whereabouts known, this proved problematic for A. D. for an extended period. After commitment in March, 1998, three months went by with no communication from A. D. to DCF. Ms. Duncan made numerous inquires to try to locate her. After a phone call on June 30, 1998 with A. D.'s mother, she sent a letter to A. D. at a shelter. It was at that point that Ms. Duncan first learned that A. D. previously had been at the Blue Hills Substance Abuse Services Program (see infra, at 13). Appointments could not be set up until early July, 1998; she attended a departmental review concerning Kayla in August 1998. Exh. 14. It was noted in the Administrative Case Review that progress toward alleviating causes of placement was "slow-dependent on mother's progress." Id. In January, 1999, she once again became whereabouts unknown after being discharged from a shelter. Her location remained unknown to DCF as of the filing of the petition in April, 1999.
Visitation
After A. D. left Kayla with D. G. in August, 1997, she did not visit Kayla until July, 1998. A. D. did not contact the DCF assigned social worker concerning visitation until July 1, 1998, almost four months after commitment. Supervised visits twice a month began in July, 1998, over ten months after A. D. left Kayla with D. G.'s family. Then, A. D. began not to appear at some scheduled visits in September, October, and November, 1998. A. D. was informed in September, 1998, that to have unsupervised visits, family therapy needed to be on-going for a while, substance abuse treatment had to be on-going, and A. D. needed individual therapy. Visits were suspended on November 24, 1998. Kayla had become upset by her mother's failures to appear. A. D. was asked to contact DCF to re-start visitation. CT Page 1854
Between a last visit on November 2, 1998 and the commencement of supervised visits again in August, 1999, a period of approximately eight months, A. D. did not visit Kayla. Since then, supervised visits have occurred fairly consistently. Exh. A (Narrative Reports of supervised visits). By this point, the petition had been filed, and the court already had determined that further efforts at reunification were not required. Administrative Case Review, dated August 2, 1999, Exh. 16. DCF facilitated visitation and provided transportation for same.
Counseling
A. D. was referred for parenting classes at Wheeler, but did not attend. She was also referred to family counseling with Kayla at Wheeler; after she attended an intake, but no other sessions, her time slot was then given to another person. Although she was encouraged to call Wheeler and set up such therapy again, she did not.
In July, 1998, she was seen by a psychologist at the Charter Oak Terrace-Rice Heights Center, Inc. for treatment of depression and anxiety "related to a five year abusive relationship, rape 9 years ago, and recent loss of custody of her daughter." Exh. 4 at 1. The therapist noted she was "seeking therapy for the first time." Id. at 3. She was diagnosed as having post-traumatic stress disorder and alcohol dependence, early remission. Id. at 4. Seizures and gastrointestinal illness were noted also. She began weekly therapy. Id. The Discharge summary reflects that she dropped out after attending six of nine appointments. Id. at 6.
Drug/Alcohol Treatment
Between April 28 and June 9, 1998, A. D. completed an in-patient program at Blue Hills Substance Abuse Services. Psychiatric Discharge Summary, dated June 25, 1998, Exh. 6. On intake, she admitted drinking one-and-a-half pints of vodka daily for the previous six months. Id. at 1. The stress of abdominal surgery, including a colostomy, was noted. On discharge, she was referred to shelters for residence and to Wheeler for dual diagnosis treatment. While A. D. reported to Ms. Duncan (who also recommended an out-patient clinical setting) that she had attended AA/NA meetings, that was not verified. Ms. Duncan never received Exh. 6. Although Ms. Duncan sent her several letters advising her of the need to follow through with out-patient CT Page 1855 treatment at Wheeler, A. D. never did this.
In August, 1999, after A. D. was again in contact with DCF, it was verified that A. D. was attending the Institute of Living's partial hospitalization/dual diagnosis program. She was attending three days per week and reported that she continued to have medical problems with her stomach. Exh. 16, Admin. Case Review of Treatment Plan, dated August 2, 1999, at 2.
Adequate Housing and Income
After her discharge from Blue Hills, in June, 1998, A. D. lived at a shelter and then its affiliated transitional living program. She was discharged in December, 1998 after becoming intoxicated and disruptive. She was referred back to the shelter. Exh. 3. She left shortly thereafter.
Ms. Duncan inquired of her whereabouts through friends and family, but they did not know where A. D. was. At the time of trial she was living with Keith's father.
She had been receiving public assistance and did some work at a shelter. Ms. Duncan reported no knowledge that A. D. had had other employment.
No Substance Abuse
Apparently, after completing the Blue Hills program in June, 1998, A. D. relapsed again, since she was discharged from the transitional living program in December, 1998 after being intoxicated. Exh. 3. Since she began visits again in August, 1999, A. D. appears to have remained sober.
No Involvement With Criminal Justice System
There is no record of A. D.'s involvement with the criminal justice system.
In addition, DCF's efforts to work with the family pre-commitment included other offered services: a VNA Home Health Aide, and ABH referral for substance abuse evaluation. Bristol Housing Authority and Bristol Community Organization. A. D. did not participate in these services.
F. Testimony By W. F.
CT Page 1856
W. F. was called as a witness by Kayla's attorney. He candidly discussed his current condition. At this time, he stated that he does not have movement on the right side of his body. Transcript of W. F.'s testimony, January 27, 2000, at 2. He expects to have movement in the right side of his body in the future, and is engaged in physical therapy. Id. Originally, after his stroke. he could not walk. Id. at 3. Six months ago, he could not talk. Id. at 1.
As to his own prognosis, W. F. stated, "I feel within another year or less or more I should be able to be on my own." Id. at 1-2. When asked how the thought of D. G. and A. G. adopting Kayla makes him feel, he stated: "Well, for now, because of my stroke, I could see it. But before my stroke I could not have seen it and they told me it was my decision." Id. at 7.
He noted that DCF had not explained to him the process of becoming licensed for adoption. Id. at 7-8. The court infers that this did not occur due to the stroke; DCF's written plan for Kayla clearly contemplated the possibility of his adopting Kayla before that event.
Kayla knows and has visited members of his family, including his children. Id. at 4. They give her gifts on holidays. Id. at 5.
When asked if someone, such as a therapist or other professional, thought that Kayla should not have contact with A. D., would he follow that instruction (if he adopted Kayla), he stated: "If it — I got to make sure of what I'm saying — the — if she was doing as bad as she was, definitely take her away from her, okay?" Id. at 9. This confirms a concern reported in discussion between Ms. Duncan and Ms. Assard-Wu in September, 1998, even prior to W. F's stroke, about his ability to set limits with A. D. as to Kayla. Ms. Assard-Wu spoke to W. F. twice about the need due to Kayla's anxiety, for A. D.'s contact with Kayla to go through appropriate channels. Clearly. A. D. believes W. F. would be more responsive to her concerns than D. G. would be. The court finds that W. F. would be very reluctant to set limits as to A. D.'s contact with Kayla or to say that A. D. should have not contact with Kayla in the event of relapse.
About D. G./A. G., W. F. had a clear, unwarranted bias. He stated "when they are alone and on their own and on their behalf or whatever, they are going to be — I think there going to be CT Page 1857 troubles caused by Kayla — adoption of her. They sound real good, but I myself feel there s something wrong with it and that's all I know. I got an instinct inside of me that's — they are no good for that." Id. at 10.
W. F. stated, that, even if Kayla were adopted by another family, he would always stay in touch with her, due to his love and affection for her. Id. at 11-12.
G. Assessments By Professionals
The court had the benefit of the viewpoints of Kayla's therapist, Ms. Assard-Wu, and Dr. Robert D. Meier, Ph.D. a clinical psychologist, both of whom testified at trial.
Ms. Assard-Wu
Ms. Assard-Wu is a licensed marriage and family therapist who has been employed at Wheeler since October, 1992. She first met Kayla in May, 1997 and has seen her regularly since then. Her diagnosis of Kayla is Generalized Anxiety Disorder. Letter to Dr. Meier, dated January 20, 2000, Exh. 10 at 1. Originally, family therapy was offered for Kayla and her mother, but her mother did not follow through. Id. Treatment for Kayla "has centered around increasing Kayla's ability to manage anxious symptoms, especially as they relate to the lack of a permanency plan and mother's substance abuse and history of abandonment of Kayla." Id. She noted that she believes W. F. is Kayla's "psychological parent." Id. She reported that she and Kayla were well aware of W. F.'s "massive stroke" and stated that she has not had face to face contact with him or with D. G. or A. F. since May, 1999, prior to the date of the stroke. Id.
Kayla remains quite clear that she does not want to live with her mother. Currently. Kayla reports that her supervised visits with her mother are uneventful; she is ambivalent about them. Id. Most recently, Kayla has shown "an increase in anxious symptoms, avoidant behaviors, and regression." Id. at 2. She attempts to avoid discussion of her permanency plan and visitation with her mother; she regresses to baby talk and reports "feeling anxious about where she will live and whether she will have to live with her mother." Id. Ms. Assard-Wu recommends "that a permanency plan be decided as soon as possible, as the continued uncertainty is a great source of anxiety for Kayla." Id. CT Page 1858
Kayla is very worried all the time. Besides the lack of a permanency plan, she worries about her mother's health and about other family members. She over-functions, tries to be perfect, and tries to make others happy. While she is concerned about not living with W. F., she is afraid she will have to live with A. D., who cannot take care of her, and that she will not be allowed to stay with D. G. and A. G. This has been expressed at least ten times. She is also afraid that her mother will not allow her to see D. G. and A G.
From the very beginning of her therapy sessions, Kayla has described the neglect and abuse which was characteristic of her life with her mother. When she was three years old, her mother locked her in a bedroom and did not feed her due to A. D.'s drinking. Numerous times she said she was afraid her mother would die from drinking. Her mother frequently passed out. On one occasion, she cracked Kayla's head open and made her hands black and blue. After she arrived at D. G's home, Kayla reported physical abuse in A. D.'s relationship with her boyfriend; she was worried about her mother's safety. In September, 1997, after Kayla was left at D. G.'s home and Kayla had not heard from her, she worried that A. D. was hospitalized. Kayla suffered from nightmares of memories of her mother's drinking. When her birthday passed in January, 1998 without her seeing her mother, Kayla was not upset since A. D. always drank on her birthday. At one birthday party, her mother, who was drunk, took her (A. D.'s) pants and underwear off.
By October, 1998, a few months after visits with A. D. had resumed but had become sporadic (and before another long hiatus in visitation), Kayla expressed her worries about people being angry with her and engaged in self-blame. In November, 1998, she reported having overheard A. D. tell D. G. that W. F. was not her real father. She said that her real father was probably bad like her mother.
In June, 1999, when W. F. suffered his stroke, Kayla expressed her worry about who would be her caretaker. Earlier, she had learned of the pendency of the termination proceedings. She stated that if her mother cared about her she would sign the papers consenting to termination. She was sad and confused by the lack of a permanency plan. In August, 1999, when her mother again sought visitation, Kayla did not want to begin visiting. By September, 1999, after visits had begun, she reported that she did not want to hurt anyone's feelings by saying where she would CT Page 1859 live. By December, 1999, she was fearful that, since her mother was now not drinking, she would have to live with her. She expressed concern that A. D. would not remain sober. She has not expressed a desire to see her mother more often, even though she enjoys visiting with A. D. and loves her. Just before trial, which she knew would be starting, she said she still hoped to live with W. F., but wanted to be with D. G./A. G. and their family if that was not possible. She loves them.
When Kayla is really anxious, she continues to revert to baby talk. According to Ms. Assard-Wu, this signifies that Kayla is really saying: "Take care of me." Kayla became more anxious when she became concerned with the termination process. Her therapist believes her anxiety would abate once she has a permanency plan. She recommends that once such a plan is put into place, Kayla should still have supervised visits with A. D.
While Kayla would like to live with W. F., who over her life has been the main stabilizing factor in it, she would adjust to permanently being with D. G./A. G after being adopted by them. Ms. Assard-Wu is confident that they would let Kayla continue see W. F. It is important, according to her, that Kayla realize that the plan for permanency is not her decision.
Dr. Meier
Dr. Meier, a licensed clinical psychologist, acting as a court-appointed evaluator, provided a psychological assessment of A. D. and also evaluated Kayla's interactions with her mother and her foster parents. He has had extensive experience in the field and has performed many such evaluations for the Superior Court. He also submitted a written report, dated December 3, 1999, Exh. 11.
Significantly, A. D. discussed the marriage to W. F., Kayla's stepfather, which she said lasted from 1990 to 1995. Id. at 3. W. F. is age 58 and is over 20 years older than A. D. She felt trapped in the marriage, started seeing a younger person, and began drinking. Id. at 4. She described W. F. as "very controlling and a heavy drinker." Id. at 3. A. D. also told Dr. Meier that she would sign the termination papers if W. F. could adopt Kayla. Id at 3. The report notes that Kayla expects to be adopted by D. G./A. G. Id.
A. D. reported current depression, panic attacks, and confused CT Page 1860 thinking. Id. at 5. Her personality assessment indicates that A. D. is experiencing significant emotional distress. Id. In view of this and her ongoing medical problems, "she would have difficulty taking responsibility for her daughter, which she seems to realize, despite feeling there has been progress in her treatment. It does not appear she would be capable of caring for this child within the foreseeable future." Id. at 6.
Dr. Meier observed Kayla with A. D. They interacted well and expressed affection for each other. Id.
He also observed Kayla with D. G. and A. G. Kayla was "very comfortable with this family, and clearly was viewed by both [of them] and the child as part of the family." Id. They would like to adopt her. They expressed their willingness to maintain contact with Kayla's family. Id. at 6-7.
Dr. Meier found that Kayla is bonded to this family. "She views them as her psychological family, although still has positive feelings for mother, [W. F.], and other family members." Id. at 7. She sees her mother as a parental figure, not as a psychological parent. He noted that Kayla views W. F. as her father. Id. Dr. Meier noted that if W. F.'s medical condition did not rule it out, "his willingness and ability to play a major role in the child's life should be reviewed." Id.
Dr. Meier concluded the following as to the placement which would be most consistent with Kayla's best interests:
 At this time it is recommended that the child remain with the [D. G./A. G.] family. She views them as her primary caretakers, and most likely her psychological family. Unless there is an option with [W. F.] that offers greater stability and support, it would be in her best interest to remain where she is. The situation with [W. F.] cannot be addressed, and little information about his role and condition were provided.
Id. at 8.
A. D. has had at least one substance abuse relapse in the past year. Relapses are not uncommon. Her prognosis was deemed "questionable at best." Id. at 9. The best predictor is what happened in the past. Dr. Meier concluded, "[i]t does not appear that mother will be able to rehabilitate sufficiently within a CT Page 1861 reasonable period of time. The child has been in placement well beyond the period of time generally recommended for temporary care. Therefore, a plan for permanency needs to be considered." Id. at 8. To some degree, Kayla expects to stay with D. G./A. G. He believes that stability and certainty for this child are very important and should be accomplished as soon as possible. Through adolescence, the stability of permanence is important. Contact with her mother should be up to her adoptive parents, in consultation with the child's therapist, who would interpret the child's desire for continuing contact.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, "if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id.
On March 10, 1999, the Superior Court for Juvenile Matters (Ward, J.) made such a finding. On that date, the court found that reasonable efforts had been made to make it possible for Kayla to return home and ruled that continuing efforts to reunify Kayla with her mother were not appropriate.
"Reasonable" in this context means doing "everything reasonable, not everything possible." In re Antonio M.,56 Conn. App. 534, 546 (2000) (internal quotation and citations omitted). Whether reasonable efforts were made depends on the circumstances of each case. Id. at 547.
Prior to the March, 1999 finding, DCF had made reasonable efforts to locate A. D. and reunify the family. DCF provided visitation and appropriate referrals. A. D. remained out of contact and failed to visit for prolonged periods of time. She did not accept and participate in appropriate referrals for substance abuse treatment and counseling, including family counseling. By clear and convincing evidence, DCF made reasonable CT Page 1862 efforts to locate A. D. and reunify the family. A. D. was unable or unwilling to benefit from reunification efforts. Based on the foregoing discussion, the evidence is also clear and convincing that the court's prior determination on reunification was correct, amply supported, and should not be disturbed.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998), cert. denied,247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c)(3).
DCF originally alleged the grounds of abandonment and failure to rehabilitate as to A. D. After the close of its case in chief, DCF withdrew the abandonment claim. The court finds that DCF has proved failure to rehabilitate by clear and convincing evidence.
Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found Kayla to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In re Hector L.,53 Conn. App. 359, 366-67 (1999). The statute does not require a parent to prove "that she will be able to assume full responsibility for her child, unaided by available support systems." In re JuvenileAppeal (843), 1 Conn. App. 463, 477, cert. denied, 193 Conn. 802
(1984). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the CT Page 1863 termination petition, it is appropriate for the court to consider not only a parent's conduct before the filing of the termination petition, but also the conduct occurring after it. Here, about nine months elapsed between the filing of the termination petition in April, 1999 and the trial in January, 2000 which is a reasonable time, especially given the age of the child.
As the Appellate Court recently noted In re Danuael D.,51 Conn. App. 829, 839 (1999). the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this adjudicatory phase, the question is whether A. D. was better able to be a parent to Kayla when the petition was filed than at the time of her commitment. See In re Michael M., 29 Conn. App. 112, 126 (1992). As noted, the petition was filed April, 1999, over one year after Kayla's neglect adjudication in March, 1998.
The evidence is clear and convincing that A. D. is not able to be a parent to Kayla and that she could not become able to do so within a reasonable time.
In accordance first with the Service Agreement and then with the court-ordered Expectations, DCF made appropriate referrals for A. D. After the commitment in March, 1998, A. D.'s whereabouts once again became unknown for three months. Visits began in the summer of 1998 but had to be suspended in the fall of that year. Her whereabouts became unknown again in January, 1999. She did not begin visitation again until August of 1999, well after the termination petition was filed in April, 1999.
DCF referred A. D. to parenting classes at Wheeler, but she did not attend. Although it was recommended, she did not participate in family counseling with Kayla after attending an intake. In 1998, after completing the Blue Hills inpatient program, she dropped out of individual counseling after attending six of nine appointments.
With regard to treatment for alcohol abuse, in 1998, A. D. completed an in-patient program then failed to follow through with out-patient services at Wheeler to which DCF had referred her. Most recently, she has attended the Institute of Living's dual diagnosis program, which she has found to be beneficial. Reportedly, she has been sober for several months. The court is unpersuaded by the argument that if, somehow, DCF had done more, rehabilitation would have occurred. DCF made appropriate CT Page 1864 referrals. A. D. did not follow through. That she ultimately went to the Institute of Living on her own is to her credit, but it is not dispositive.
In parental termination cases, the court is entitled to give great weight to the views of professionals. In re Christina V.,38 Conn. App. 214, 221 (1995). The court credits Dr. Meier's statement that, in the case of severe substance abuse, such as this, the past is the best predictor of the future. Based on her history, the likelihood of A. D.'s relapse is strong. Most recently, Kayla has regressed emotionally in response to her mother's renewed visitation. She has not expressed a desire to see her mother more often. Throughout her therapy, including recently, she has manifested fear that she will be returned to her mother's care. She remains a very worried child.
A. D. reported to Dr. Meier in December, 1999 that she remained depressed, and suffered panic attacks and confused thinking. She is experiencing significant emotional distress. Her physical problems appear to be chronic in nature. The court credits Dr. Meier's view that she would not be capable of caring for Kayla within the foreseeable future. The court's finding is supported also by A. D.'s testimony. A. D. candidly admitted that she cannot take care of Kayla, which she attributed to her medical condition and finances. She would consent to the termination of her rights if W. F. adopted Kayla; she would like to continue to visit Kayla.
It is evident that A. D. has not gained the ability to care for Kayla's needs. In fact, Kayla remains fearful that that very thing will occur, that she will be placed in her mother's care. There is no reason to believe that A. D. will be able to assume a responsible position in Kayla's life within the foreseeable future.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF had proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2); In re Juvenile Appeal (83-CD),189 Conn. 276, 285 (1983). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5. CT Page 1865
As our Supreme court has stated, "Too often the courts of this state are faced with a situation where, as here, litigation has continued for years while the children, whose interests are supposed to be paramount, suffer in the insecurity of `temporary' placements." In re Juvenile Appeal (83-CD), 189 Conn. at 292. Because of the deleterious effects of prolonged temporary placement, "time is of the essence." In re Antony B.,54 Conn. App. 463, 476 (1999); In re Alexander V., 223 Conn. 557, 565
(1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R., 47 Conn. App. 124, 131 (1997).
In the face of this clear decisional authority A. D. and Kayla's attorney argued that termination should be denied because it is the only way to assure that Kayla will maintain her relationships with W. F. and A. D. As an alternative, they suggest long-term foster care with A. G./D. G. or with W. F. If a termination is ordered, they seek a court order to prevent DCF, as statutory parent, from submitting D. G. and A. G.'s names to the Probate Court for adoption of Kayla without first having given W. F. time to become licensed as an adoptive parent and without an assessment by DCF's permanency planning personnel of W. F. as the adoptive parent. They seek an order for an interactional study of Kayla's relationship to W. F. for provision to DCF. They request also that the court direct that a copy of the transcript of these proceedings or of this Memorandum of Decision be provided to the Probate Court by DCF when adoption is sought.
With regard to the plan that D. G. and A. G. adopt Kayla, the child's attorney argued that it did not create a "warm" feeling, since, prior to W. F.'s stroke, they agreed to adopt Kayla if W. F. could not. A. D.'s attorney asked that Kayla's wishes to live with W. F. be heard and contended that the plan for D. G. and A. G. to adopt her had "no heart."
The court is unpersuaded by these arguments. They ignore the evidence and the recommendations of the professionals who testified. The plan for D. G. and A. G. to adopt Kayla has both "heart" and "warmth." D. G.'s family's commitment to Kayla and her family (including A. D. and W. F.) repeatedly has been demonstrated. First, they took A. D. and her children into their home when A. D. was struggling with an abusive relationship and severe alcohol abuse. Presumably, D. G. was A. D.'s one sober friend. She took Kayla and A. D. in when her own younger daughter CT Page 1866 was one-and-a-half years old. Then, she and A. G. took excellent care of Kayla when A. D. left to go off with her abusive boyfriend. They helped to maintain Kayla's relationship with W. F. by having her visit him along with their daughter, T., on overnights. After his serious stroke, D. G. and A. G. had W. F. to their house for Thanksgiving and Kayla's birthday. D. G. now picks up W. F. to bring him to see Kayla's dance lessons. D. G. permits Kayla to speak to W. F. daily by phone. As to A. D., D. G. firmly stated that if she were to adopt Kayla, A. D. could continue to visit Kayla, if certain perfectly reasonable conditions were met. The court credits her statements. Based on her actions, there is no reason to doubt her sincerity.
On the record presented, the best thing A. D. ever did for Kayla was to bring her to D. G.'s home. A. D.'s emotional condition, her current hostility towards her former friend, and her baseless fear about future contact with Kayla are distorting her view as to what is in Kayla's best interest.
Kayla's attorney argued for court-ordered restraints on the adoption process and that W. F. should adopt her, claiming he is her true "psychological parent," notwithstanding the availability of adoption by D. G. and A. G. The concept of the "psychological parent" repeatedly has been discussed by Connecticut courts in cases of this type. Soon after its publication in 1979, the Supreme Court cited Goldstein, Freud Solnit's Beyond The Best Interests of The Child ("Beyond") and the authors' "suggestion that child placement should maintain `on a continuous, unconditional, and permanent basis a relationship with at least one adult who is or will become the child's psychological parent.'" Seymour v. Seymour, 180 Conn. 705, 711 (1980) ("Seymour"). "Such a characterization serves to emphasize that the concept of the psychological parent is not a fixed star by which custody decisions can invariably be guided." Id. at 711-712.
Beyond, at 98, defined a "psychological parent" as "one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs, as well as the child's physical needs," quoted in Temple v. Meyer, 208 Conn. 404, 408. n. 3 (1988); see also, In re Tricia A., 1998 Ct. Sup. 2290, 2296 (February 27, 1998) (Quinn, J.), affirmed., 55 Conn. App. 111 (1999); In reFour Children, 1997 Ct. Sup. 10217, 10225 (October 10, 1997) (Foley, J.). Nothing in Beyond "is inconsistent with a child's CT Page 1867 having two psychological parents, as would normally be the case in an intact family." Seymour, 180 Conn. at 712; In re JessicaM., 217 Conn. 459, 474 (1991). Indeed, a child may have multiple psychological parents. In re Michael and Mamie M.,1991 Ct. Sup. 5041, 5044 (June 28, 1991) (Brenneman, J.), affirmed,29 Conn. App. 119 (1992).
Of course, in some cases "`it is a disadvantage for the child to be in the care of the psychological parent.'" Seymour,180 Conn. at 712 (quoting Leonard Provence, "The Development of Parent-Child Relationships and the Psychological Parent," 53 Conn. B. J. 320, 327 (1979)). "[A] court has an independent responsibility to assure itself of the suitability of the parent to whom the child is primarily attached. Seymour,180 Conn. at 712.
Our Supreme Court also has recognized that the traditional notions of nuclear family have, in recent years, come to be "`replaced by various configurations of parents, stepparents, adoptive parents and grandparents', and we should not assume that the welfare of children is best served by a narrow definition of those whom we permit to manifest their deep concern for a child's growth and development." Doe v. Doe, 244 Conn. 403, 442 (1998) (citation omitted).
The court finds, based on Ms. Assard-Wu's and Dr. Meier's testimony and reports, that D. G., A. G., and W. F. all are psychological parents for Kayla. While Ms. Assard-Wu viewed W. F. as her psychological parent, she had not seen either him or D. G. and A. G. with Kayla since May, 1999. In contrast, Dr. Meier viewed D. G. and A. G. as her psychological parents, based on his December, 1999 observations of Kayla with them. Clearly, A. D. is not Kayla's psychological parent. Although Kayla loves her, she is fearful, and has been for a long time, that she will be placed in A. D.'s care.
Without question, long-term foster care is not in Kayla's best interest. As both Ms. Assard-Wu and Dr. Meier stated, she needs a permanency plan now. In the face of these termination proceedings, she has regressed emotionally. Her placement and permanency status are a source of continuing anxiety for her. Long-term foster care would only prolong her temporary status and, in all likelihood, cause her to regress further. As our Supreme Court has stated, for Kayla, time is of the essence. She should be permitted to go about her life without anxiously CT Page 1868 wondering with whom she will be living and whether she has somehow disappointed those who love her.
Whether or not W. F. will recover more fully from his stroke is uncertain. What is clear is that he stated that he understands that "for now" it is best that Kayla stay with D. G. and A. G. due to his stroke. Kayla's best interest requires, after her prolonged stay in temporary foster care, that she be adopted now, not at some uncertain date in the future.
In addition, were Kayla to go to live with W. F., that would create the meaningful risk for Kayla that W. F. would not be able to properly restrict contact between Kayla and A. D. That contact, while maintaining their relationship, also causes significant anxiety for Kayla. There is also some risk that A. D. will resume living with W. F. Adoption by D. G. and A. G. would ensure not only that Kayla's and A. D.'s relationship would continue (as would her relationship with W. F.), but also that it would be properly monitored by parents who, unfettered by a prior failed marital relationship with A. D., will properly restrict or suspend contact if need be. It is doubtful how W. F. would handle a relapse by A. D.
Also, if Kayla were placed with W. F., she would be put into a new living situation, with W. F., his daughter, and her children, with whom Kayla has never lived on a day-to-day basis. In contrast, her foster family, including her best friend, T., already is a familiar setting for her. The stability of that loving family is established already; the alternative of W. F.'s household creates the potential for other, unknown problems, and instability.
This child has been subjected to enough in her young life. It is time to put what is best for her first, after years of volleying her about emotionally. Her voice has been heard by the court. Ms. Assard-Wu stated she will adjust to being adopted by D. G./A. G. That is credited by the court. She loves them and is bonded to them. They would help Kayla maintain her relationship with W. F., as they have since she came to them in 1997.
The court rejects the concept that since D. G./A. G. were prepared to adopt if W. F. could not, that makes adoption by them somehow second best. If, prior to W. F.'s stroke, they had pushed for adoption against W. F.'s wishes, they would have been criticized in these proceedings for overreaching. D. G. is a CT Page 1869 caring, thoughtful, and level-headed mother. Her in-court testimony reflected her evident affection for Kayla. Her restraint on the witness stand was an admirable manifestation of her maturity, since she was testifying face-to-face with an anguished A. D., her former friend, about the child both of them love.
Based on the foregoing findings and discussion, the court finds, by clear and convincing evidence, that termination of A. D.'s parental rights is in Kayla's best interest. Kayla needs and is entitled to permanency and stability in order to continue to properly develop. If A. D.'s rights were allowed to continue, Kayla would continue to be subjected to the very fears that have maintained her anxious condition to this point, causing significant damage to her. To permit this would truly constitute ignoring her as a person.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (d). See In re Tabitha P.,39 Conn App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Kayla and offered appropriate and timely services for visitation, for substance abuse counseling, for family and individual counseling, for parenting skills, as well as other support services. These services were relevant to A. D.'s needs.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds, by clear and convincing evidence, that DCF provided visitation, relevant services and referrals, and made reasonable efforts to reunite the family. These efforts were hampered by A. D.'s long periods of no contact with Kayla and DCF. There was no reasonable possibility of reunification as a result of A. D.'s failure to utilize services and the gaps in her willingness and ability even to visit Kayla. CT Page 1870
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The reasonable court-ordered Expectations were discussed above, at 10-14. As noted. DCF provided appropriate referrals and opportunities for visitation. A. D. did not come close to fully adhering to those Expectations. She did not keep her whereabouts known and did not keep appointments set by and with DCF. She did not visit Kayla for lengthy periods of time. She did not participate in parenting classes. She did not engage in family counseling except for a single intake. She did not consistently engage in individual counseling or substance abuse treatment. She did not maintain adequate housing or income. She did avoid involvement in the criminal justice system.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the court finds that Kayla is bonded to D. G., A. G., and W. F. They are her psychological parents. While Kayla loves A. D., she is a parental figure, not a psychological parent. Kayla is very fearful that she will be place in her mother's care. This is a dominant theme of her condition of anxiety.
5) The age of the child.
Kayla is now age ten. She requires stability in her life and time to heal. She is entitled to live and grow up without fearing that she will be returned to her mother's care. Leaving her in the "limbo" of foster care would not be in her best interest. Two years and five months in foster care is more than long enough.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but no limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental CT Page 1871 visitation communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds A. D. has not made reasonable efforts to adjust her circumstances or conditions to make it in Kayla's best interests to return to her in the foreseeable future. In 1997, A. D. left Kayla with others. For months, she had no contact with her. Then, after starting visitation again, another long period of no contact occurred. She has acknowledged that she cannot care for Kayla. She will not be able to care for Kayla in the foreseeable future. Further delay in providing permanency for Kayla would be inappropriate.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, A. D. did not face unreasonable interference from anyone or from economic circumstances. Her predicament is a consequence of her own actions and her failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Kayla D. for termination of parental rights to enter with respect to the mother, A. D. Accordingly, the court hereby grants the petition to terminate the parental rights of A. D.
The court further orders that the Commissioner of DCF is appointed statutory parent to Kayla. The court declines to restrain DCF in the adoption process. The foster parents have stated their willingness to adopt. It is the court's direction that they receive first consideration.[5] The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered. CT Page 1872
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT