[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above entitled case seeking a dissolution of the marriage of the plaintiff Joseph Woszczyna (46 years old) and the defendant Miroslawz Woszczyna (44 years old) was commenced[1] in the Judicial District of New Britain and was eventually transferred to the Regional Family Trial Docket (complex litigation) in the Judicial District of Middlesex. Victoria (eleven years of age[2]) is the only child issue of the marriage. This litigation raises issues of custody and visitation with the minor child, and financial matters.
 I
The court is compelled to comment on a preliminary matter. The estate of the parties prior to the commencement of this action can best be described as modest. The pleadings in this case are voluminous and several judges have had their input involving many court hours. As a result, the parties have incurred substantial legal fees for themselves and fees for the attorney for the minor child and expenses for experts, all of which will surely total in excess of $200,000. Much of these costs are attributable to the plaintiffs need to dominate, his failure to obey court orders and the succession of attorneys he retained.[3] The plaintiff, although a very intelligent person, did not use very good judgment in allowing himself to be engulfed in this legal morass CT Page 2359 incurring these enormous legal fees which were the result of his arrogant conduct.
Furthermore, and much more important, both parties have demonstrated their willingness to engage in combative behavior in the presence of Victoria, which is psychologically damaging to her. In short, the inability of the plaintiff and the defendant to find common ground not only had a telling effect on their pocketbooks, but, more importantly, an adverse psychological impact on Victoria, the child they both love.
Although this court has the jurisdiction to dissolve the marriage, the plaintiff and defendant will still be bound together as a result of being the parents of Victoria. The court is powerless to compel them to be civil to each other in order to promote the best interests of their child, but surely their love for Victoria and their concern for her best interests should provide a compelling motive to do so. In the words of Victoria — they simply have to take a "chill pill."[4]
 II The Irretrievable Breakdown of the Marriage
The plaintiff and the defendant were married on November 18, 1989 in Elblay, Poland. The plaintiff was on an extended vacation in Poland where he met the defendant a native of Poland. They returned to the United States in April of 1990 and moved into the home of the plaintiffs father.
In 1993, after Victoria was born, the defendant became employed as a nursing assistant and worked the third shift at a hospital. This enabled her to care for Victoria's needs during the day. She earns approximately $42,000 per annum, but in order to achieve these earnings she must work seven days a week (her hourly compensation is $11.67).
The plaintiff has a bachelor of arts degree in psychology, a bachelor and masters degree in engineering from Worcester Polytechnic Institute. He is the assistant chief engineer of a major hospital and earns approximately $80,500 per annum.
In 1994, the parties purchased land in Southington for $50,000 and built their home on the land.
The deterioration of the marital relationship was fueled by a miscarriage and the defendant's inability to subsequently conceive. The defendant became depressed over the marital relationship, and her grueling work schedule. CT Page 2360
The parties have continuously argued and, because they continue to live under one root those arguments intensified. At times the plaintiff has referred to the defendant as a "whore," "rotten inside" and used other vulgarities. Many of the arguments occurred in the presence of Victoria. This eleven year old child would unsuccessfully attempt to halt the argument by placing herself physically between her mother and father. of course this outrageous conduct is detrimental to the child.
The plaintiff would secretly tape record his conversations with the defendant during which he would provoke her in order to obtain evidence. This occurred before this action was commenced, but after he consulted with an attorney, and continued during the litigation. To find that the marriage of the parties has broken down irretrievably would be to state the obvious.[5]
 III Contempt of Court and Failure to Disclose
In addition to being devious, the plaintiff is also arrogant and in contempt of an order of the court. This arrogance and contemptuous conduct are demonstrated by his failure to abide by a specific order of the court (which is the subject matter of the defendant's motion for contempt[6]) and then he attempted to justify his actions by claiming ignorance, failure to understand the order of the Court and advancing absurd excuses.
On May 4, 2001, the Court (Devine, J.) found the value of a savings account in which the plaintiff deposited the inheritance he received from his father to be $87,411.22 (inheritance account) and the Uniform Gift to Minor Account in the amount of $14,287 (UGMA account). The court ordered that from the inheritance account the plaintiff pay to the attorney for the defendant $7,500 toward his fees, from the UGMA account $5,000 to the attorney for the minor child as a retainer and that no further withdrawals be made by either party without an order from the court.
The plaintiff claims that it was his understanding that the order of the court would permit subsequent withdrawals without court approval as long as both parties agreed. He claims that the defendant consented.[7]
The defendant called as a witness Attorney Eliot Nerenberg, the plaintiffs third matrimonial attorney, who represented the plaintiff at the time the order of the court was entered with respect to the bank accounts. He testified that it was his recollection that the court "ordered that nothing else be paid . . . unless there was further order of the court or agreement of the parties." It is apparent that Attorney CT Page 2361 Nerenberg's recollection is faulty. First, the transcript of the order of the court (Devine, J.) is absolutely clear that there was no exception to the order. ("Neither party will invade remaining balance of UGMA or inheritance account $79,811.22."[8]) Second, the trial notes of Attorney Nerenberg clearly reflect that there were to be no withdrawals unless approved by the court. ("Neither party will invade remaining balance of UGMA or inheritance account [and with an amount below the word "inheritance" he wrote] $79,811.22."[9]) Third, because the order is directed to both parties it is not credible to believe that either party could consent. ("Neither party will invade . . ." (emphasis supplied.[10]) Furthermore, the court notes that Attorney Nerenberg was the first beneficiary of the plaintiffs violation of the order of the court — the day after the plaintiff and the attorney discussed the withdrawal from the inheritance account, Attorney Nerenberg received from that restricted account $20,000 toward his fees that were due to him from the plaintiff.
Even if there was some ambiguity in the court's order, which there isnot, the court would find the plaintiff in willful contempt. Sablosky v.Sablosky, 258 Conn. 713, 723. ("We emphasize that we hold only that a finding of wilfulness as a predicate to a judgment of contempt of court is not barred, as a matter of law, by the fact that the terms of the judgment involved are ambiguous. Such ambiguity is merely one of the factors for the trial court to take into consideration in exercising its discretion regarding a finding of wilfulness.")
The court finds with respect to the withdrawals made by the plaintiff from the inheritance account in the amount of $59,000 (leaving a balance of approximately $21,250.00) that the plaintiff willfully violated the court's order.
The plaintiffs arrogance is further demonstrated by his failure to disclose on his financial affidavits in violation of his oath and his continuing duty to disclose discoverable material; Practice Book §13-15; the pendency of a personal injury claim he had pending against a third party. The plaintiffs attorney presented on his behalf the following excuses: the plaintiff did not know it was reportable, or, in the alternative, he did not realize it would result in a recovery of any more than his medical and other expenses. The court rejects both excuses and finds the plaintiff willfully failed to disclose the personal injury claim in violation of his oath on the financial affidavit and his continuing duty to disclose discoverable evidence.
The Court, will further address these issues in Section VII, infra, of this decision. CT Page 2362
 IV Custody of the Minor Child
Victoria is a delightful child. She is intelligent, excels academically, plays the violin, takes Polish lessons, is active in the ballet and is artistic (described by her school social worker as "really talented."[11]) Both the plaintiff and the defendant love Victoria and she in turn loves them. Victoria has been described as "a lovely and mature youngster who is devoted to her parents and hurt by their hurt."[12]
Because of the complexity of this case, the court ordered that the parties be referred to Dr. Anne Phillips, a licensed clinical psychologist, in order to perform a custody and parental access evaluation. Dr. Phillips, found in part (which also reflects the findings of this court) the following in her report dated December 30, 2000:
"The Woszczyna family is clearly one which has experienced considerable turmoil through much of their marriage, and that turmoil has been psychologically harmful to all parties. Nevertheless, it is apparent that both adults love their daughter and wish the best for her, and their devotion to her has contributed to her being a lovely and loving young lady. At the same time, she is a youngster who is keenly attuned to parental feelings and opinions in ways that detract from her own development and freedom to individuate. Victoria has been drawn into parental conflicts excessively and experiences some confusion about her own rights and opinions as a result. To her credit, Victoria maintains some capacity for individual assertion and for managing her own safety needs, but the necessity of doing so is costly in terms of her long term development.
"[The plaintiff and defendant] are both insecure and needy individuals who have been deeply disappointed by the course of their marital relationship and unable to overcome their own, separate, feelings of betrayal and loss. [The defendant] is a markedly depressed woman who appears to have been particularly depressed by the loss of a pregnancy and subsequent infertility, as well as by her sense of being ill-used by her husband and his family. . . . While [she] evidences a close and devoted relationship to her daughter, she does appear vulnerable to deferring so much of her time and energy to Victoria that her daughter feels protective and emotionally obligated to her mother. . . . Overall, however, [the defendant] does appear to have been consistently and actively involved with her daughter and is more intuitively aware of her daughter's emotions and needs than is her husband. Victoria also appears more relaxed and less fearful with her mother, better able to assert CT Page 2363 herself and her needs with her mother, who is also more responsive to Victoria's criticisms and requests. At the same time, Victoria is protective of her mother in ways which may not be completely healthy for her as she matures.
"[The plaintiff] is a narcissistically vulnerable and insecure man who copes through obsessiveness and activity, in dramatic contrast to his wife's more passive style. His need for personal recognition and assertion tends to obscure the reactions of others so that he has limited awareness of, or empathy for, the feelings of others, particularly when he feels vulnerable or criticized. . . . [T]he intensity of Mr. Woszczyna's need for recognition and dominance make it very difficult for him to acknowledge mistakes or to entertain differences of opinion, and he is prone to over-interpreting criticism or threat from others. . . . It is clear that [the plaintiff] is anxious to be a good father and wishes to share with her his intellectual interests and achievements. He appears to try hard to provide for her and to work with her to praise and develop her talents. [The plaintiff] does have difficulty, however, in recognizing and respecting Victoria's separate needs and relationships, and is inclined to try to dominate her attention and to elicit unconditional approval and cooperation from her. Victoria appears to feel particularly stressed by her father's emotional demands and to have less expectation of physical caretaking or emotional understanding from her father than from her mother. Although loyal and loving with her father, and very anxious for his praise, Victoria does not feel that her father always respects her needs or viewpoints and is confused by his continued pressure to agree with him. She appears instinctively to understand his neediness, but is somewhat less inclined to attend to his emotional needs than she is her mother, in part because she experiences her mother as making more personal connection and sacrifice for her. . . .
"It does appear that both parents have been very involved with Victoria through her life and are dedicated to her, but also that [the defendant] has had the primary responsibility for child care and is the primary attachment figure for her daughter. Victoria is consistent in her assertion of preferring to live primarily with her mother. Although this is partially reflective of her emotional protectiveness with her mother, it is also reflective of her greater comfort and familiarity with her other and her insecurity about her father's acceptance and constancy with her. [The defendant's] suggestion that shared custody would be most appropriate does not appear to be in Victoria's best interest. On a pragmatic level, she has made clear her wish to avoid continual changes in residence. On a developmental level, Victoria has already negatively impacted by the continuing hostilities between her parents and their continuing to draw her into their positions, and has been vulnerable to trying to mediate or resolve their conflicts. An access arrangement whichCT Page 2364continued Victoria's exposure to that conflict and competition is notrecommended as it would perpetuate a situation which has already beenpainful and damaging to her." (Emphasis supplied) (Phillips Report)
The issue of custody is explicitly governed by General Statutes § 46-56 (b). It directs the court to be concerned with "the best interest of the child." "Accordingly, our case law makes it clear that when determining the custody of minor children the ultimate test the court must apply is the `best interests of the child.'" (Citation omitted)Cookson v. Cookson, 201 Conn. 229, 241 (1986).
General Statutes § 46b-56a provides for joint custody which "means an order awarding legal custody of the minor child to both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents. The court may award joint legal custody without awarding joint physical custody where the parents have agreed to merely joint legal custody." In other words, §46b-56a envisions two types of joint custody — physical custody and legal custody. Joint physical custody simply means joint sharing in the physical custody of the child which is usually accompanied by a parenting plan as to the manner in which both parents will share in that custody. Joint legal custody "means an order awarding legal custody of the minor to both parents, providing for joint decision-making by the parents"; General Statutes § 46b-56a; with respect to the child's welfare, education, health issues and other matters pertaining to the well being of the child. "The difference between a sole [legal] custodian and a joint legal custodian is that the sole [legal] custodial has the ultimate authority to make all decisions regarding a child's welfare, such as education, religious instruction and medical care whereas a joint legal custodian shares the responsibility for those decisions." (Internal quotations and citations omitted) Carroll v. Carroll, 55 Conn. 18, 26
(1999).
 A. Physical Custody
The plaintiff originally seemed to advocate for both joint physical and legal custody of Victoria. He subsequently amended his claim for relief seeking "shared joint legal custody of the minor child Victoria" with the primary residence being with the defendant. The court assumes the plaintiff although he phrases it as "joint legal custody" seeks both joint physical and legal custody, with a parenting plan that provides that Victoria's primary residence be with the defendant.
Victoria has made it clear that her primary residence should be with the defendant. Although she is eleven years old, Victoria is, in the CT Page 2365 words of her counsel, "a mature, intelligent, observant and thoughtful child."
Another matter to consider in awarding physical custody of Victoria is which parent will facilitate visitation with the other parent. Seymourv. Seymour, 180 Conn. 705, 713 (1980). (A relevant factor in determining the issue of custody, is the "willingness to facilitate visitation" with the other parent). The plaintiff is angry with the defendant and intolerant of her mental state. Although the defendant, at this time, would not actively facilitate visitation with the plaintiff, the court is of the opinion that the plaintiff would attempt to destroy the relationship between mother and daughter.
Furthermore, Victoria has a special relationship with her mother. This, however, is not to suggest that she does not love her father. She "feels more relaxed with her mother and is more reliant on her mother with daily routines, social activities and homework, and is slightly more anxious about her father's approval or disapproval than her mothers'." (Phillips Report, p. 15.)
The court finds that it is in the best interests of Victoria to award physical custody to the defendant mother with visitation for the plaintiff father set forth in Section V of this decision.
 B. Legal Custody
All parties including the attorney for the minor child agree that the plaintiff and the defendant should be granted joint legal custody of Victoria. The attorney for the child, however, qualifies this as follows: "The Defendant shall make all day-to-day decisions regarding Victoria's care and well-being." Joint legal custody is supported by the fact that they have shared goals for Victoria with respect to academe, cultural, religious and extracurricular activities. Both parents have been involved with Victoria and are dedicated to her. These shared goals, dedication and love for Victoria, would normally dictate for an order of joint legal custody.
Indeed, there is a statutory presumption that joint legal custody "is in the best interests of a minor child where the parents have agreed to an award of joint custody . . ." General Statutes § 46b-56c. However, "[t]he ultimate decision as to joint custody rests with the trier of fact and must be based on all of the testimony and factors that are properly brought before the court, including the ability of the trier to observe the demeanor and manner in which the witnesses answer pertinent questions. In reaching a judgment with regard to custody, the trier must consider not only the final answer to a question but also the CT Page 2366 entire evidentiary fabric that has been established at the trial." Timmv. Timm, 195 Conn. 202, 209 (1985).
Joint legal custody requires that both parents be able to effectively communicate with each other even if they share the same values for the child. The anger they have for each other is demonstrated by the above discussion. As a result of this anger, they are unable to communicate with each other even when it involves the best interests of Victoria. The same reasons the court has fashioned its orders regarding visitation (Section V, infra) in order to minimize the physical and verbal contact between the plaintiff and defendant dictate that joint legal custody should not be granted by the court even though the parties agree to it. Simply put, joint legal custody would be disastrous for Victoria. It is not in her best interest at this time.
Joint legal custody may be appropriate in the future once the parties can separate themselves from each other. The fact they are still living under one roof has probably inflamed the situation. As recently as January 23, 2002, after the court heard all the evidence in this matter, the defendant filed another motion for a restraining order and exclusive possession of the marital home, alleging outrageous conduct on the part of the plaintiff.[13] Although the Court has not heard any evidence to substantiate the defendant's claims, this motion demonstrates the rancor that at least the defendant perceives.
Accordingly the court will order that the defendant mother be granted custody (both physical and legal) of Victoria.
 V Visitation for Plaintiff
The court agrees with Dr. Phillips and the attorney for Victoria, that a visitation schedule be adopted whereby the contact between the plaintiff and the defendant be at a minimum. The combative conduct on the part of the parents is devastating for Victoria.
Dr. Phillips summed it up as follows: "On a developmental level, Victoria has already been negatively impacted by the continuing hostilities between her parents and their continuing to draw her into their positions, and has been vulnerable to trying to mediate or resolve their conflicts. An access arrangement which continued Victoria's exposure to that conflict and competition is not recommended as it would perpetuate a situation which has already been painful and damaging to her." (Phillips' Report, p. 19.) The court is also mindful, that Victoria expressed that she "thinks [it is] tough to go back and forth, CT Page 2367 but she knows that that's part of divorce."[14]
In addition, the court assumes that the attorney for the minor child discussed the subject with Victoria and the attorneys' recommendation to the court are consistent with Victoria's desires. Although not controlling, the preferences of Victoria should be taken into consideration. The court, however, has varied from the attorney for the minor child's recommendation to a limited degree.
1. Basic visitation: The plaintiff shall have the following visitation with Victoria:
 (a) Every other Friday commencing two Fridays after the date of this decision he shall pick Victoria up at school and he shall return her to school the following Monday;
 (b) If the Monday following the plaintiffs weekend is a legal holiday and he is not required to be at his place of employment, then he shall return Victoria to school on Tuesday morning; otherwise, Victoria shall be returned to the defendant's home by 7:30 a.m. on that Monday; and
 (c) Every other Wednesday, commencing the second week after the first weekend visit, the plaintiff shall pick up Victoria at school and he shall return her to school Thursday morning.[15]
2. School breaks: The plaintiff shall have the following visitation with Victoria during the February and April school vacations:
 (a) In odd years, the plaintiff shall have visitation with Victoria during the February vacation from the first Friday of the vacation after school and return her to school Monday morning following the vacation;
 (b) In even years, the plaintiff shall have visitation with Victoria during the April vacation from the first Friday of the vacation after school and return her to school Monday morning following the vacation;
(c) If the plaintiff does not travel out of state with Victoria during his February and April parenting times, then the defendant may have access to Victoria two afternoons during those weeks, at a convenient CT Page 2368 time and returning her to the plaintiffs home by 8:00 p.m.; and
 (d) The regular visitation schedule shall control during the even-year February and odd-year April school vacations, unless the defendant has made pre-approved plans to travel with Victoria to visit family in Poland, in which case the plaintiffs parenting time with Victoria shall be suspended.
3. Summer schedule: The school year visitation plan shall continue through the summer months, except that the plaintiff shall have access to Victoria at the defendant's home at 3:30 p.m. on alternate Wednesday and Fridays, and shall return her to the defendant's home at 7:30 a.m. on alternate Thursdays and Mondays.
4. Transportation to activities: If the plaintiff has visitation with Victoria when she has a planned extra-curricular activity, he shall be responsible for transporting her to the activity.
5. Holiday schedule: (a) During even years, Victoria shall spend the July 4th holiday, Christmas and Easter with the plaintiff; (b) During odd years, Victoria shall spend Thanksgiving, Christmas Eve and the New Year's holiday with the plaintiff; (c) The Thanksgiving holiday shall be from 10:00 a.m. to 8:00 p.m.; (d) Christmas Eve shall be from 3:00 p.m. to 10:00 p.m.; (e) Christmas Day shall be from 8:00 a.m. to 8:00 p.m.; (f) The New Year's holiday shall be from 3:00 p.m. on December 31st through 8:00 p.m. on January 1St; (g) Easter shall be from 8:00 a.m. to 8:00 p.m.; (h) The July 4th holiday shall be from 10:00 a.m. to 11:00 p.m.; (i) The holiday schedule shall supercede regularly scheduled parenting time, with no make-up time scheduled; and (j) The parent spending the holiday with Victoria shall be responsible for all transportation and the other parent shall have Victoria ready for pick-up at the appropriate time.
6. Telephone access: Victoria shall always be allowed by both parents to communicate with the other by telephone whenever she requests. Each parent may call Victoria by 9:00 p.m. to wish her good night. Victoria shall determine the length of all telephone conversations and both parents shall honor her wishes. Neither parent shall interfere with or tape her telephone conversations with the other parent. If Victoria is unavailable for an evening telephone call, that information will be conveyed courteously between the parents and Victoria will be directed to return the call that evening when she becomes available.
 VI
CT Page 2369 Other Non Financial Orders
1. Plaintiff's therapy with the minor child: The plaintiff shall immediately engage the services of a qualified professional to address extant interpersonal issues between him and Victoria and the name of that professional shall be furnished to the attorney for the child. The therapist shall have access to Phillips Report, so that she can specifically address her concerns arising from boundary issues, anger management and Victoria's individuation. The defendant shall participate in this therapy at the therapist's request, to address the above issues or other parenting issues which may from time to time arise. Should this therapist recommend individual therapy for Victoria, the parties shall immediately follow those recommendations.
2. Victoria's health, dental and therapeutic care: The plaintiff shall have access to the names, addresses and telephone numbers of all health providers, if requested. The defendant shall provide all necessary authorizations for these health care providers in order to release all information regarding Victoria to the plaintiff
3. Relocation: The defendant shall furnish the plaintiff with thirty days notice before she relocates her residence with Victoria and if the planned relocation is out of the State of Connecticut ninety days notice shall be given. The defendant will furnish the plaintiff with the address and telephone number of the relocated residence as soon as it is available. The plaintiff will furnish the defendant with the address and telephone of his residence and telephone number and any changes thereafter.
4. Non-interference with other parent: Each parent shall forthwith cease to denigrate and insult the other parent, either in Polish or English, in front of Victoria. This includes, but is not limited to, statements and personal criticisms regarding behavior, looks, age, lifestyle choices, future partners, extended family members, home conditions and parenting choices. Each parent will make an affirmative effort to support the other parent as Victoria's parent. Each parent has an affirmative obligation to avoid arguing with the other parent in Victoria's presence.
5. Restrictions: Both parents shall refrain from using alcoholic beverages when Victoria is in his and her care. Neither parent shall keep adult reading and video materials anywhere in his and her home where Victoria might find them; any areas of privacy in each home should be made clear to Victoria. Neither parent, however, shall question Victoria regarding the other parent's possible violation of the above-restricted CT Page 2370 activities. Neither parent shall tape record any conversation with the other parent.
 VII Contempt of Court, Martial Residence and Other FinancialOrders
1. The court finds the plaintiff in willful contempt of the May 4, 2001 order of the court (Devine, J.) that neither shall invade remaining balance of the inheritance account then amounting to $79,811.22. In violation of this order, the plaintiff made thirteen withdrawals, leaving a balance of $21,008.84. The court will take this contempt into consideration when fashioning its financial orders with respect to the division of property.
2. The court orders that the plaintiff is to vacate the residence at 20 Windward Place, Southington, Connecticut (marital residence) within ten (10) days of the date of this order and the defendant shall have the right to occupy the premises exclusively.
3. The plaintiff will quit claim to the defendant all his right, title and interest in the marital residence within two weeks of the date of this judgment, and the defendant shall assume the first mortgage and the equity line of credit subject to the following: all the accrued interest that is due as of the date of this judgment and all monthly mortgage payments (including real estate taxes) in arrears shall be paid by the plaintiff within two weeks of the date of this judgment.
4. The plaintiff shall pay from the inheritance account the attorney's fee due to the attorney for the minor child and the fees due to Dr. Anne Phillip and Dr. Les Lothstein. Since there is insufficient funds available in the inheritance account, the balance will be paid from the plaintiffs other assets. These payments shall be made within seven days of the date of this judgment.
5. Child support: The plaintiff shall pay to the defendant as child support an amount determined by the Child Support Guidelines, with no deviation.[16] Defendant's overtime and bonuses for working third shift shall be averaged and included in the calculation. Unreimbursed and uninsured costs shall be likewise determined pursuant to the Child Support Guidelines. Payment of unreimbursed, uninsured and co-pay costs shall be made within seven (7) days of presentation. If the defendant decides that it is in the best interests of Victoria that she not work on those weekends that Victoria is at home with her, this should constitute a substantial change of circumstances to justify a redetermination of CT Page 2371 support for the minor child.
6. Daycare: Until Victoria is thirteen (13) years of age, any camp program that the parents enroll her in during the summer shall be considered as a childcare cost, and shall be appropriately divided pursuant to the Child Support Guidelines. The parents shall consult on available programs for Victoria and shall not limit themselves to day camps, keeping in mind Victoria's growing interest in the world around her, and shall consider residential camps for her summer care as well. The parties shall divide the cost of the Defendant's work-related child-care arrangements in accordance with the Child Support Guidelines.
7. Dependency exemption: The parties shall alternate Victoria as a dependency exemption for state and federal tax purposes. The plaintiff shall have that exemption for all even tax years and the defendant shall have that exemption for all odd years.
8. Retirement accounts: Based upon the plaintiffs superior ability to acquire future assets and his overall income-earning capacity, education and training, the retirement accounts should be divided as follows: the plaintiff shall transfer $20,000 of his Hartford Retirement account via Qualified Domestic Relations Order to the Defendant, said QDRO to be drafted by the defendant's counsel; the defendant shall keep her own 403B plan.
9. Savings accounts: Shall be evenly divided between the parties.
10. Legal fees: Except as set out above with respect to the fees for the attorney for the minor child and the prior orders of the court, each party shall be responsible for payment of the balance of his and her respective legal fees.
11. Alimony: After the subtraction of each party's respective child support obligation, the plaintiff shall pay to the defendant, as periodic alimony, the sum necessary to bring them to parity.[17] Alimony shall last for seven and a half years from the date of judgment, reflecting the approximate date when the child shall no longer be in high school, and shall be non-modifiable as to term only.
12. Wage execution: Alimony and child support payments shall be by immediate wage execution and the plaintiff is responsible for ensuring the payments are timely made until the wage execution is effective.
13. Exchange of tax information: The parties shall exchange all W-2 and 1040 statements by February 15th of each year (except for the year of 2001, said information shall be exchanged by March 15, 2002) for as long CT Page 2372 as there is any support obligation in place, and any child support and alimony modification calculations shall be made by March 15th of that year.
14. Life insurance: The plaintiff shall maintain whatever life insurance is currently in effect naming as beneficiary the defendant as trustee for Victoria, and this shall continue until there are no support obligations remaining. Said insurance policies shall remain unencumbered.
 VIII Personal Property
The personal property of the parties shall be divided as follows: the plaintiff shall have title to the Chrysler 300 and the defendant to the Chrysler Cirrus. The furniture and belongings that were the plaintiffs father shall be his property. With respect to the remaining personal property, it is difficult to determine who should take the particular items — indeed, if the Court made it at this time it would be an arbitrary decision. Accordingly, the court orders within five days of the date of the filing of this decision, that the parties shall meet with the attorney for the minor child who will mediate the issue of distributing the remaining personal property. The attorney for the minor child shall take into consideration that the minor child's residence will be with the defendant and that the plaintiff will have the child every other weekend and every other Wednesday. If there is a dispute between the parties, the court will hold a hearing on the contested items.
 IX Jurisdiction
Pursuant to General Statutes § 46-4, the undersigned judge shall retain jurisdiction of this matter including, if necessary, the determination of the reasonableness of the fees for the attorney for the minor child.
 X Conclusion
Although the undersigned judge has not had an opportunity to meet Victoria, she is obviously a talented and delightful child. Both the plaintiff and the defendant have not only the ability but also the obligation to contribute to the healthy development of their child. She CT Page 2373 loves both her parents and they love her.
The court has found it necessary to elucidate in detail the orders with respect to visitation and other matters in order to protect the best interests of Victoria. Nevertheless, what would really be in the best interests of Victoria is a schedule which is more flexible, and that meets her needs at the time. This can only be accomplished if both parties are able to communicate with each other in a civil manner and recognize that the vehemence between them is detrimental to the person they love the most — Victoria. Her future is in their hands.
Robert I. Berdon, Judge Trial Referee