[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON
CT Page 2980 MOTION TO REOPEN JUDGEMENT FOR MODIFICATION OF CUSTODY AND PARENTING PLAN (MOTION #136)
Pursuant to Connecticut General Statutes sections 46b-56[1] and Connecticut Practice Book section 25-26, the court heard evidence concerning the plaintiff's motion to modify custody and visitation. The plaintiff seeks sole custody of the four minor children of this marriage.
I. PROCEDURAL HISTORY
On May 19, 1997, the trial court, Ballen, J., entered an order dissolving the parties' marriage, incorporating into his judgment a written separation agreement. The court gave the parents joint legal custody of their four children: Ridgely Whitmore, (hereinafter Ridgely W.) born July 14, 1987; Austin Sherwood, born June 19, 1989; Nolan Gilbert, born April 27, 1993; and Wyatt Wallace, born October 31, 1995. The court accepted a detailed parenting understanding. Within weeks, these parents were back in court. Throughout the years, these litigants filed motions concerning custody, visitation, changes of residence, financial awards and contempt.
The issue before this court is the latest in a long clash over issues relating to the four children. On August 31, 2000, pursuant to the defendant's request, the Bridgeport Family Relations Office attempted to resolve differences the parties had concerning visitation and parenting issues. That mediation was unsuccessful. Thereafter, that office conducted a full visitation and custody study, submitting a study on June 20, 2001. As a result, in August 2001, the plaintiff filed her original motion to modify custody and visitation. An amended motion followed on October 15, 2001. In the amended motion, the plaintiff sought sole custody of the four minor children. The court heard evidence or argument on six separate trial dates from October 15, 2001 to March 1, 2002.[2]
II. STATEMENT OF FACTS
Based on the evidence introduced at the trial, the court finds the following:
When the marriage of the parties was dissolved in 1997, the judgment included a parenting plan. Therein the litigants stated: "We have chosen to resolve our parenting issues through the process of negotiation because we feel confident in our abilities to problem-solve with each other as parents in a reasonable and fair manner." The spirit of cooperation lasted less than a month. CT Page 2981
At the time of the dissolution of the marriage, the plaintiff and defendant lived on adjacent properties in Darien, Connecticut.[3]
Despite the good intentions of the parties, there were immediate problems. The plaintiff desired organization and structure. She wanted the four children to follow a schedule. The defendant, whose role was more a playmate than aparent, preferred to disrupt the plaintiff's plans. He felt that the structure was unnecessary.
In 1998 the plaintiff and the four children moved to New Canaan, Connecticut. All four children are enrolled in the New Canaan public school system. Currently Ridgely W. is a freshman in New Canaan High School, Austin attends middle school, and Nolan and Wyatt are in elementary school. The defendant constantly undermined the plaintiff's authority and belittled her in the presence of the children. Rather than discuss the children in a civilized adult manner, the defendant preferred to use them as a conduit for conversation. A preferred method of communication was to call the plaintiff while he was driving with the children in his car. At other times, he simply ignored her.
The need for organization should have been self-evident. There were four children involved. The necessity was heightened by the fact that two of the children, Ridgely W. and Wyatt, have critical developmental issues. Ridgely W. suffers from Asperger's syndrome, a form of autism. Wyatt, although not officially diagnosed, might suffer from schizophrenia or autism. of the two parents, only the plaintiff provided attention to medical requirements that included essential therapy. She arranged all appointments and transportation. She ensured that the service providers were paid and that the children received proper treatment.
The defendant's total lack of cooperation diluted the plaintiff's efforts. For example, Wyatt's medical condition requires regularly administered prescription medication. Despite the severity of his condition, the defendant routinely failed to give this child the required medicine.[4] At trial, he could identify neither the medication nor its dosage. Furthermore, he was not sure of the type of therapy that the child received. The defendant displayed the same cavalier attitude when addressing the children's education. He challenged all decisions by school officials, but failed to participate properly in the decision making process. He ignored or rescheduled appointments, yet criticized placement decisions. If his demands were not met, the defendant threatened legal action.
In all essential areas, the defendant offered challenge rather than cooperation, fighting every decision from the children's dental hygiene to their religious affiliation. Although the defendant loved his CT Page 2982 children, he did not exercise adult judgment when dealing with them. On those school nights when he had overnight visitation, the children were adversely impacted. They did not arrive at school on time. They were not prepared for assignments. Their clothes were dirty and disheveled. The children did not have the necessary school supplies, library books, and permission slips and lunch money. Administrators at all the children's schools lodged complaints.[5] In response to the criticism, the defendant blamed all deficiencies on housekeepers. His excuses did not address the children's issues.
The defendant's relationship with his children is that of a companion rather than a responsible parent.[6] He has egregious lapses of judgment, especially in the area of firearm safety. When the defendant still lived in Darien, his sons regularly visited; they remained overnight. By his own admission, these four children are "wild and rambunctious." They have natural curiosity and, at least in the case of Wyatt, are not always aware of safety considerations. Nevertheless, the defendant left unsecured, possibly operable, firearms and live ammunition in the basement of the Brookside Road home. After he moved from that home, he left firearms in the trunk of his car. The children had access to all these items. They never received proper gun safety courses. The defendant's precaution, telling the boys that they would loose their shooting privileges should they abuse the firearms, provided no security. As the defendant himself admitted, the children would "figure out a way" to get to the guns.
The defendant's financial difficulties and housing situation aggravate the problems with his children. Although the defendant is an attorney, he has been temporarily suspended from the practice of law. Even before the suspension, he was significantly in arrears in his child support obligation.[7] No payment has been made since September 2001. The defendant has made multiple applications for bankruptcy protection; in his latest submission he did not list his child support as a legal obligation.[8] The plaintiff has become the sole financial support for the children, two of whom need extensive therapy. Because the defendant has not provided continuous insurance coverage, the plaintiff must provide advance payment before the children receive medical treatment.[9]
After the defendant lost his Darien home to foreclosure, he moved to the Milford Academy in Milford, Connecticut. He currently resides in the area of that school formerly reserved for the headmaster. The defendant provides some services to the school but there is no formal employment contract.[10] Although the quarters might be appropriate as a temporary lodging for the defendant alone, they are not suitable for the Brown children. The actual living arrangements are nomadic. There are no kitchen facilities. Furthermore, the students who-attend the academy are CT Page 2983 all significantly older than are the defendant's children.[11]
Milford Academy is heavily mortgaged. To cover operating expenses, the school borrowed approximately $800,000. Although the academy's headmaster was optimistic,[12] the holder of the note, Mr. Joseph Kelley, expects the principal and interest to be paid in full before June 2002. Because Mr. Kelly is not inclined to refinance the note, the future of Milford Academy, and thus that of the defendant, are both uncertain. The court finds that the living arrangement is precarious, at best.[13]
Despite this unsettled living arrangement, the defendant wants greater control over the oldest child, Ridgely W. Ignoring the fact that a child who has Asperger's syndrome needs structure and stability, the defendant engaged in what this court considers irresponsible conduct, promising the child that he could transfer to a private school and live with his father at Milford Academy during the week. As a result, Ridgely Jr. expressed a desire to live with his father.[14]
The New Canaan public school system has provided specialized education designed to assist Ridgely W. with his disability. The child is socially withdrawn and has difficulty interacting with peers. Although intelligent, the child needs stimulation.[15] For years, although he lived in Darien, Ridgely W. attended a special education program in Trumbull. He was not progressing.
The plaintiff actively researched alternative forms of education. She determined that the New Canaan school district provided particularized care for children with Asperger's syndrome. Darien officials agreed to pay for the costs of the New Canaan special education program. Although he never participated in the child's education or therapy, the defendant disagreed with the change of placement. He threatened to sue Darien if the town transferred Ridgely W. As a result, Darien officials withdrew their offer. In order to provide her child with the education he needed, the plaintiff was forced to sell her home and move to Darien. The defendant attempted to enjoin that move.
The defendant did not dispute the fact that New Canaan provided an excellent education. Unfortunately, the defendant did not take the time needed to familiarize himself with Ridgely W.'s courses or daily activity. He did not even know the number of hours his child spent daily in classrooms. He protested the school's refusal to place Ridgely W. in an honors science program, yet blamed the school when the child failed a basic science course. In the defendant's opinion, Ridgely W.'s problems stemmed from the fact the child did not receive adequate attention as a member of the New Canaan High School freshman football team.[16]
CT Page 2984
Without consulting school officials, his child's therapist or the plaintiff, the defendant unilaterally concluded that Ridgely W.'s problems would be alleviated if the child played football. He convinced his son that the child should immediately transfer to Notre Dame High School in Fairfield. The defendant chose Notre Dame High solely because he is closely acquainted with that school's football coach. He has never visited the school. He is unaware of its academic program, special education capacity, counseling assistance or general mission. He has never even seen the school, but assumes it has adequate structure, teachers, and library facilities.[17]
More importantly, the child's admission was not a certainty. He has never even received an application form. There is no credible evidence that Ridgely W.'s size alone would result in "expedited admission." Indeed, there was no guarantee that the child, even if accepted, could play football at that school. Finally, there are no funds available for the $6,000 annual tuition at that private institution.
The defendant conceded that children with Asperger's syndrome often display symptoms such as withdrawn, anti-social behavior or preoccupation with one topic to the detriment of all others. Nevertheless, the defendant suggested a change of schools primarily to encourage Ridgely W.'s recently acquired consuming desire to play football. Before the defendant introduced this topic, Ridgely W. had been doing well at New Canaan High School. As a result of the defendant's unwarranted actions, the child's academic performance has deteriorated. Ironically, the defendant admits that if the child is not accepted at Notre Dame, New Canaan provides an adequate public school alternative.
The court does not suggest that the defendant does not love his sons nor is there any indication that the children do not reciprocate. These feelings are not contrived. They were noted in the family relations report. That same report noted, however, that these parents have different parenting skills. This observation was confirmed during the six-day trial. The defendant's approach does not provide any of the structure that all these children require.
III LEGAL ANALYSIS
Connecticut General Statutes § 46b-56 provides in relevant part: "(a) In any controversy before the Superior Court . . . the court may at any time make or modify any proper order regarding. . . custody and visitation. . . ." In considering modification of custody or visitation orders, the court must be guided by the best interest of the children and not the best interest of the parties. General Statutes § 46b-56 (b) (1); Seymour v. Seymour, 180 Conn. 705, 709, 433 A.2d 1005 (1980). In CT Page 2985 order to prevail on a motion to modify custody, the moving party must prove by a preponderance of the evidence that there has been a material change of circumstances which alters the initial order. Alternatively, a court must conclude that the original custody or visitation order was not based upon the best interests of the child. Hall v. Hall, 186 Conn. 118,122, 439 A.2d 441 (1982). Not all changes in circumstances since the date of the judgment are material. Simons v. Simons, 172 Conn. 341, 344,374 A.2d 1040 (1977). "Neither parent's interests with regard to his or her children are a property right. . . . A contest relative to . . . [custody] is not one primarily to determine the rights of the respective parties but rather a determination of the best interests of the child or children. . . ." Raymond v. Raymond, 165 Conn. 735, 741, 345 A.2d 48
(1974); Kelly v. Kelly, 54 Conn. App. 50, 55, 732 A.2d 808 (1999)
"To obtain a modification, the moving party must demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either party to it. Because the establishment of changed circumstances is a condition precedent to a party's relief, it is pertinent for the trial court to inquire as to what, if any, new circumstances warrant a modification of the existing order. . . . The power of the trial court to modify the existing order does not, however, include the power to retry issues already decided. . . . Rather, the trial court's discretion only includes the power to adapt the order to some distinct and definite change in the circumstances or conditions of the parties." Kelly v. Kelly,54 Conn. App. at 56 (citations omitted).
The court first finds in the instant case that there has been a material change in circumstances. Despite their optimistic expectations at the time of the dissolution, these parents cannot come to agreement on any important developmental issues effecting their children. Furthermore, the defendant has engaged in conduct that adversely impacts the health and safety of these children.
The defendant has assumed the role of companion rather than parent and as such has undermined the plaintiff's authority in virtually every important aspect of the children's lives. The disagreement would be serious enough. This problem is compounded by the fact that there is a tremendous disparity in their approach to the issue of the children's emotional and psychological development. There is further friction over the children's academic progress. Additionally, the defendant is opposed to third party caregivers.[18] Over time, the defendant increased his vocal disdain for the plaintiff, sharing these opinions with the children on all available occasions. He unilaterally disregards her choices.
The plaintiff and defendant also disagree over the issue of firearm CT Page 2986 access. The plaintiff prefers total control and restricted access, with gun safety courses a high priority. The defendant has a more relaxed approach that borders on neglect. That casual view extends to the children's hygiene and personal appearance. Again the plaintiff tends to be more vigilant.
The court finds that there has been a material change in circumstances since the original custody determination. The next question is whether it is in the children's best interest that the court enter an order of sole custody.
The defendant challenges any change from joint legal custody even though he and the plaintiff fail to agree on any significant matter. Joint custody is dependent on an ability of the parties to communicate. It also requires mutual respect. In the present case, in virtually all developmental areas, these parents have disparate philosophies. They cannot agree on anything significant. There is extraordinary hostility between these parents. Fortunately for the children, the plaintiff encourages the children's relationship with their father. The defendant, however, uses every opportunity to denigrate the plaintiff.
The "court has ha[d] the opportunity to view the parties first hand and . . . assess the circumstances surrounding the . . . action, in which such personal factors as the demeanor and attitude of the parties are so significant. Leo v. Leo, 197 Conn. 1, 4, 495 A.2d 704 (1985); Tutalo v.Tutalo, 187 Conn. 251, 445 A.2d 598 (1982). Weinstein v. Weinstein,18 Conn. App. 622, 625, 561 A.2d 443 (1989).[19] Their present parenting skills are a critical factor.
IV. ORDERS
In determining the best interests of the children, the court has considered all of the factors which have been recognized by the appellate courts of this state as being relevant, including, but not limited to character, willingness to facilitate visitation, credibility, continuity and stability of environment and the wishes of the children.[20]
Although both parents obviously love their children, it is in the children's best interest that, during their childhood, they have the opportunity to develop a meaningful relationship with their father. It is not in their best interest that he control any of the vital areas of the children' s development.
Accordingly, in consideration of these findings and the relevant law, the court orders as follows:
1. The plaintiff, Heather Brown, shall maintain sole CT Page 2987 custody of the minor children. She shall remain designated as the primary residential parent and shall be responsible for the day-to-day care and upbringing of the minor children.
 2. The defendant shall have unsupervised visitation at his home with the children on alternate weekends from 7:00 p.m. on Fridays to 7:00 p.m. on Sundays, provided that the defendant maintains an adequate permanent residence. Weekday visits shall be in accordance with the parties' agreement of December 2001. The defendant shall be available to the plaintiff by telephone at all times during such visitation.
 3. The defendant shall not remove the children from the state of Connecticut at any time for any reason without prior order of the court.
 4. Except in the case of emergencies, the defendant shall not seek the services of a physician or dentist for the minor children.
 5. Each parent will employ either an answering machine, fax, beeper or answering service at all times and will respond to inquiries and messages left by the other parent promptly. The minor children are not to be used to convey checks or messages, verbal or written, between the parents. Neither parent will do or say anything to or in the presence of the minor children that would tend to detract from the ordinary love and affection of the minor children for the other parent.
 6. Each party shall pay their own attorney's fees. They shall equally share in the payment of counsel fees for the minor children.
Orders shall enter accordingly. All other consistent orders remain in effect.
DEWEY, J. CT Page 2988