[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: Plaintiff's Amended Motion to Modify Post-Judgment (#141)
This memorandum of decision addresses the plaintiff's post-judgment motion to modify the parenting orders between these formerly-married parties. In that motion, she has requested court approval to relocate with the parties' now four-year-old son to join her new husband in Texas. For the reasons stated below, the motion is granted.
On February 2, 2000, the court, Robaina, J., dissolved the parties' marriage and adopted their written stipulation granting the parties joint legal custody of their son, with physical residence to the plaintiff mother. The agreement adopted by the court also provided that neither party would change permanent residence without written permission of the other party or court order. In accordance with that proviso, on August 21, 2001, the plaintiff filed a motion requesting court approval to relocate with the minor child to the State of Texas to obtain increased pay, responsibility, and benefits from her employer (court file #117). That motion was referred by the judicial district of New Haven to the regional family trial docket for trial, held before this court over three days in March and April of this year. At trial, the court granted the plaintiff's permission to amend her motion to state that she had remarried CT Page 10099 and sought to live in Texas with her new husband as a basis for relocation. Each party testified at trial, as did the following witnesses:
 • Jeffrey Moreira, senior resource manager at SBC SNET, the plaintiff's employer;
• Carmella Delvecchio, the plaintiff's mother;
• Manuel Arriaga, the plaintiff's husband;
• Maria Smith, the defendant's aunt;
 • Charles J. Forcier, a family relations counselor employed by the judicial branch and who prepared a custody evaluation completed on December 19, 2001; and
 • Attorney Anthony Wallace, court-appointed guardian ad litem (GAL)
 I — FINDINGS OF FACT
The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law. Upon such consideration, the court finds the following facts to have been proven, as well as additional facts included in later sections of this decision.
The parties were married in November 1996; and their only child, Michael, was born approximately a year and a half later, on May 19, 1998. In March 1999, when Michael was less than a year old, the defendant went to Florida for a "bike week," described at trial as a sort of convention-rally for motor cycle enthusiasts such as the defendant. There he met and became romantically involved with another woman, Kim Young. Not long after, the plaintiff filed an action to dissolve the marriage; and when the parties separated in January 2000, she assumed physical custody of their child. After the separation, the defendant visited Michael daily during his lunch break from work at the home of the paternal grandmother, who had provided full-time daycare for the child since infancy because both parents worked. He did not, however, exercise the parenting time with his son on alternating weekends to which he and the plaintiff had agreed.
In April of 2000, the defendant moved to Florida to live with Ms. Young. An ASE Master Technician, the defendant has worked as an CT Page 10100 automobile technician since his graduation from high school. He had worked for a Saturn auto dealership in Branford, and found a job at a Saturn auto dealership in Florida. After living briefly with Ms. Young, he also bought a house there. Although initially intending to visit his son at least once in Connecticut, he did not do so.[1] Despite intending his move to Florida to be permanent, the defendant soon grew unhappy there. He missed his large and extended biological family in Connecticut. When he returned to Connecticut in August 2000 for a visit with Michael, his son did not recognize him. Upset and hurt, he decided to move back to Connecticut. The defendant left his newly-bought home in Florida vacant, returned to Connecticut, and resumed working at the Saturn dealership in Branford.
Ms. Young also left Florida and brought her two children, ages ten and eleven, with her to Connecticut. The defendant and she set up house here, and after the defendant sold his Florida house in December 2000, they moved into a home he bought in East Haven. Although they became engaged in June 2001, their relationship has not been completely stable and they have separated at least twice. Ms. Young's two children have had difficulty adjusting to the move from Florida, being away from their father, and having the plaintiff assume a parental role toward them. One of the two children has since gone to live with Ms. Young's sister in Massachusetts.
After returning to Connecticut, the defendant again saw Michael daily at the paternal grandmother's house during lunch. He did not exercise weekend visitation, however, until a few months later, beginning in January 2001. Since then, he has regularly seen Michael. In March 2001, the visitation agreement was modified so that the defendant spends alternating weekends with Michael from 1:00 p.m. Saturday to 8:00 p.m. Sunday and every Wednesday from 5:00 to 8:00 p.m. Since returning from Florida, the defendant has developed a close relationship with his son. Michael has his own bedroom at the defendant's house, complete with child-appropriate posters, and his own toys and clothing. Michael gets along well with Ms. Young and her two children. When with his father, Michael also gets the opportunity to see his grandmother and other paternal relatives regularly.
Rejected by her husband for another woman and left to care for Michael by herself after the defendant moved to Florida, the plaintiff met Manuel Arriaga "online" over the internet in July 2000. That September she met Mr. Arriaga face-to-face when he flew to Connecticut from his home in Texas for a weekend. Since then, the plaintiff and he have visited each other one or two weekends a month, flying back and forth between Connecticut and Texas. They became engaged in August 2001 and married each other in February of this year. She was already engaged to Mr. CT Page 10101 Arriaga when she filed the original motion seeking permission to relocate. Although that motion only identified job-related reasons as a basis for relocation, her relationship with Mr. Arriaga was her primary motivation for filing the motion.
The plaintiff's new husband, Manuel Arriaga, is an assistant manager of an auto rental agency at the Dallas — Fort Worth airport. He is also divorced and two of the five children from his previous marriage live with him; every other weekend, he has parenting time with all five of his children from that marriage. Although he now lives in a home owned and also occupied by his 91-year-old great-aunt, the plaintiff and he intend, if she moves there, to buy their own home for themselves and their children.
The plaintiff currently lives with her son in a 900-square-foot condominium with two bedrooms in North Branford. Her home is worth approximately $120,000, and she has approximately $45,000 equity in the premises. Since the cost of living in Texas is less expensive than here, that equity could purchase a larger home in Texas. She is employed as a senior administrative assistant to a senior manager at SBC SNET, a telecommunications company headquartered in San Antonio, Texas. She has held that position for six years and earns between $45,000 and $47,000 a year, plus an annual, though not guaranteed, bonus of up to an additional eight per cent of salary. She has received such a bonus in each of the last two years. Although she does not have a guaranteed job waiting for her Texas, it is likely, under the SBC "career path" for persons in her job classification, that she could obtain a job with comparable responsibility and compensation there.
 II — ISSUES PRESENTED
The plaintiff's post-judgment motion seeking court authorization to relocate with the parties' child is governed by Ireland v. Ireland,246 Conn. 413, 717 A.2d 676 (1998). Our Supreme Court held there that a custodial parent proposing to relocate after a dissolution judgment bears
the initial burden of demonstrating, by a preponderance of the evidence, that (1) the relocation is for a legitimate purpose, and (2) the proposed location is reasonable in light of that purpose. Once the custodial parent has made such a prima facie showing, the burden shifts to the noncustodial parent to prove, by a preponderance of the evidence, that the relocation would not be in the best interests of the child. CT Page 10102
Id. at 428.
Although acknowledging that the term "best interest of the child" has no precise definition, the Ireland court endorsed the following factors as particularly relevant to ascertaining a child's best interest in a relocation case:
 • each parent's reasons for seeking or opposing the move,
 • the quality of the relationships between the child and the custodial and noncustodial parents,
 • the impact of the move on the quantity and quality of the child's future contact with the non-custodial parent,
 • the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move,
 • the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements, and
 • the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships.
Id. at 431-432.
The Ireland court carefully noted, however, that these factors were neither "exclusive, nor should any single factor be presumed to carry dispositive weight. Moreover, any other facts or circumstances that could have a bearing on the court's determination of the child's best interests should be considered and given the appropriate weight in a court's analysis." Id. at 434-435. The Ireland court thus recognized the inherently case-specific nature of determining the best interest of a particular child. The courts have cited many factors that may affect a child's "best interest." See e.g. Seymour v. Seymour, 180 Conn. 710ff;Janik v. Janik, 61 Conn. App. 175, 181, 763 A.2d 65 (2000), cert. den.255 Conn. 940, 768 A.2d 949 (2001); Rudolewicz v. Rudolewicz, 12 CLT No. 39, p. 664, Superior Court, judicial district of Hartford-New Britain CT Page 10103 (October 6, 1986, Arena, J.). As this court has stated previously, "[t]he best interest standard is inherently flexible and fact-specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare."In re Diane W., Superior Court for juvenile matters, child protection session at Middletown (December 21, 2002). In making its decision here, this court has fully considered the Ireland factors, the body of case law regarding best interest, the specific facts of this case, the testimony and credibility of the various witnesses here, and the court's assessment and evaluation of the best interest of the particular child affected here.
 III — DISCUSSION
Under the Ireland decision, the court must first consider the plaintiff's reasons and motivations for moving. The court finds that she has easily met her "initial burden" of proving by a preponderance of the evidence that relocation to Texas is for a legitimate purpose, and that the proposed location is reasonable in light of that purpose. She became romantically involved with Manuel Arriaga only after the defendant had abandoned her for another woman and left her to care for their child alone so that he could pursue that new relationship in Florida. Her desire for another intimate relationship was as normal and natural as the defendant's. At that point, she had no reason not to pursue a romantic relationship with Mr. Arriaga, no matter where he resided. Moving to Texas so that she could live with him was thus, even before the defendant's return, already an inevitable possibility, as living with one's lover or spouse is the most normal desire in the world. Moving to live with Mr. Arriaga is a legitimate purpose for the plaintiff to relocate, and Texas is a reasonable place for her to move in light of that purpose.[2]
The court also finds that the plaintiff's life will be enhanced and enriched emotionally by moving to Texas and living with her new husband.[3] There they could build a new life together and a new family. Michael's life, happiness, and welfare are ineluctably bound with those of the plaintiff, who has been his primary caretaker since birth. They have, as the Ireland court recognized, formed a "new family unit," and Michael's best interest is now tied firmly to his mother's happiness, well-being and interests. Her move to Texas would enrich her life and undoubtedly leave her much happier and more fulfilled. Michael would benefit in many ways from his mother's greater happiness and contentment. He would benefit as well from having a second adult figure in his household, Mr. Arriaga, to provide guidance and affection.
In considering whether such a move would be in Michael's best CT Page 10104 interest, the court must consider, as Ireland directs, "the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements." Michael is still too young to talk meaningfully on the telephone to his father or send him letters or e-mails. Thus his relationship and contact with his father will be limited, at least for a while, primarily to in-person contact with the defendant. Recognizing the necessity of such face-to-face contact, the plaintiff proposes that Michael spend six weeks in the summer with his father, a week in March and in October during school vacations, a week in December, every other Thanksgiving week, and reasonable liberal and flexible access to Michael in Texas upon two weeks written notice to the plaintiff.
The distance, time, and cost of travel make the present schedule of alternate weekend visitation, either by the child here or the plaintiff there, unfeasible and undesirable. Traveling to and from Connecticut and Texas takes at least six hours each way, even with a nonstop three-and-a half hour flight. Michael is too young to travel by himself yet. The court also concurs with the family relations counselor's conclusion that it is not feasible for a child of Michael's age to fly to Connecticut every other weekend, even if accompanied by an adult. Since Michael is a very energetic child, it would be extremely difficult to make him sit down for 3 1/2-hour plane trips, particularly twice in a weekend or every other weekend.
The evidence also establishes that it would not be feasible or desirable for the defendant father to visit Michael every other weekend in Texas. The plaintiff acknowledged at trial that traveling frequently to Texas would pose a financial burden for the defendant — the plaintiff herself spent almost $30,000 between September 2000 and February 2002 traveling to Texas to see Mr. Arriaga once or twice a month. To assist the defendant in meeting the costs of visitation, the plaintiff has proposed reducing the amount of his weekly child support payment from $135 per week to $100 per week and eliminating his contribution to approximately $80 per week contribution to day care. The plaintiff's proposal would give the defendant an additional $6,000 per year that he could use to pay for air fare, lodging, car rental, meals, activities, and other expenses while visiting Michael. Even with the reduction in child support proposed by the plaintiff, however, the defendant would not have sufficient income or resources for him to afford alternating weekend trips to Texas to see his son.
Since frequent weekend hotel visitation in Texas is neither feasible nor, as the family relations counselor testified, desirable, and Michael is too young for effective telephone or e-mail communication, the best way to preserve the father-son relationship for the immediate future CT Page 10105 would be for the defendant to have periodic and regular parenting time with Michael for longer than a weekend. The plaintiff has proposed that the defendant have three week-long visits with Michael in Connecticut — during school term vacations in March, October, and December — plus six weeks in the summer and another week every other November. Yet until Michael begins school, there is no reason that such week-long visitation could not be more frequent. Bi-monthly visitation for two weekends and the intervening week, for a total of nine days, would give the defendant and Michael sufficient time on each visit for the reintroduction" or "reunification" process that family relations counselor Charles J. Forcier testified is often necessary when a parent and young child have been apart for a period of weeks or months. These alternating month nine-day visits would also give the minor child an opportunity to spend extended time with the paternal grandparents and his extended family. Although such frequent week-long visitations would end when Michael begins school, by then the child's sense of memory and time will have developed more, he will be more adept at using a telephone to speak with his father, and e-mail, instant messaging and other uses of the internet to maintain the parent-child bond will gradually become more feasible.
If the plaintiff moves to Texas with the parties' child, Michael would lose the benefit of having his father participate in many of the normal incidents of parenting, such as attending or coaching the child's recreational activities (gymnastics, sports, etc.) or attending school conferences or performances. The GAL cited the loss of these incidents of frequent parent-child contact as a key reason for recommending against relocation. Yet as the Ireland court recognized, "less frequent but more extended visits over summers and school vacations" can also be conducive to maintaining a close parent-child relationship." Ireland v. Ireland, supra, 246 Conn. 434. The Ireland court also noted that sometimes `[i]t may not be realistic to try to preserve completely the quality and nature of the relationship that the noncustodial parent enjoyed with the child, especially if such preservation is maintained at the cost of the custodial parent's ability to start a new, potentially improved life for herself or himself and the child." Id. at 422.
Both the family relations counselor and guardian ad litem testified here that they believed allowing Michael to relocate to Texas would not be in his best interest, both providing essentially the same reason — that because of the distance between Texas and Connecticut and the time and expense of travel, at Michael's age and stage of development it was not possible to devise suitable visitation arrangements that would allow father and child to maintain their relationship. In considering the child's best interest, a court may take into consideration the opinion of a family relations counselor; Yontef v. Yontef, 185 Conn. 275, 281, CT Page 10106440 A.2d 899 (1981); and that of the guardian ad litem, Janik v. Janik;61 Conn. App. 175, 181, 763 A.2d 65 (2000), cert. den. 255 Conn. 940,768 A.2d 949 (2001); yet the court is not bound by the testimony of either witness as to individual best interest factors or their opinion as to the ultimate issue here, whether Michael's relocation to Texas would be contrary to his best interest. Ford v. Ford, 68 Conn. App. 173, 190,789 A.2d 1104 (2002), cert. denied 260 Conn. 910 (2002). For the reasons stated above, in this case, the court, after considering all the evidence, weighing all the factors mandated by Ireland v. Ireland, and considering all other factors the court finds relevant to this child's best interest, does not find their recommendations persuasive.
The benefits to the plaintiff, her son, and their "new family unit" of relocating to Texas and beginning life with her new husband there are many and obvious. Since frequency of visitation is the best way to maintain a relationship with a young child, frequent week-long visits will enable father and child to maintain and develop their relationship during the child's preschool years. As the child gets older and enters school, he will see his father less frequently, but by then a solid parent-child bond will have been cemented and can be maintained by less frequent but extended visitation and other methods of parent-child contact (such as telephone calls, e-mails, and, perhaps, "virtual visitation" over the internet; see McCoy v. McCoy, 336 N.J. Super 172,764 A.2d 449 (Appellate Division 2001); Armstrong v. Armstrong, docket number FA 012-0728168S, Superior Court, judicial district of Hartford (Berdon, J.T.R., July 25, 2002)[4]). The court thus concludes that the defendant has not met his burden of proving, by a preponderance of the evidence that, it would be contrary to Michael's best interest to allow him to move to Texas with his mother.
The court is not without sympathy for the defendant father. Despite shirking parenting responsibilities and abandoning his child earlier in Michael's life, the defendant has gradually accepted a paternal role, albeit one that is somewhat limited; even during this trial, for example, the defendant missed a previously scheduled parent-teacher conference at the daycare center. Yet the defendant bears some responsibility for the present predicament. When he left the plaintiff behind to care for their child alone while he pursued a distant romantic interest, he had no legitimate reason to expect that her romantic pursuits might not also take her elsewhere. The plaintiff "s long-distance romantic relationship with a potential husband only began after that. The defendant's own actions since the dissolution have firmly tied Michael's best interest to that of his mother. His relationships with his son, his fianceé, and even his other mother all show a certain instability — including leaving his son behind when he moved to Florida; arguments with and separations from Ms. Young; and regular periods when CT Page 10107 he does not speak to his mother. Based on his past conduct, the court can have no confidence that he would necessarily continue living in Connecticut even if the plaintiff's motion were denied.
Ireland v. Ireland directs courts, in deciding whether to permit a custodial parent to relocate with the child and assessing the possible life enhancement of such a move to that parent and the child, ultimately to base its decision on the best interest of the child. That court also imposed the burden of proof on that issue on the non-custodial parent. The dispositive issue here is neither the right of the plaintiff to relocate nor the defendant's right to a relationship with his son, but resolving the balance between the enhancement in the plaintiff's (and minor child's) life by relocating to Texas with Michael's interest in having a meaningful relationship with his mother and father. The Ireland
factors are all relevant to resolving that balance in this case and the court has considered them all in concluding that the defendant has not sustained his burden of proof of establishing that such a move would be contrary to Michael's best interest. Whenever a custodial parent moves to a distant location, the visitation rights of the noncustodial parent are adversely affected. In this case, however, that fact alone is not contrary to Michael's best interest, for alternative methods of visitation and contact can preserve his relationship with the defendant. Michael will visit his father for extended parenting time several times a year, and in addition, the defendant may elect to visit Michael on occasion in Texas. While the distance between Connecticut and Texas will surely reduce the frequency of the defendant's contact with the minor child, and reduced frequency of visitation will affect the quality of relationship between father and son, there are sufficient means of preserving that relationship and a good bond between the two.
 IV — ORDERS
For the foregoing reasons, the plaintiff's motion to relocate to Texas with the minor child is granted, as set forth below. Moreover, the court also enters the following additional orders:
1. The court finds that the current child support amount being paid by the defendant, for $135 per week, remains the presumptive child support amount. Upon the plaintiff's relocation to Texas, the court finds that it would be inequitable and inappropriate to continue the child support award in that amount because of extraordinary parental expenses for visitation; Regs. Conn. State Agencies § 46b-215-3 (b)(3)(A); and special circumstances in this case based on the best interests of the child, pursuant to Regs. Conn. State Agencies § 46b-215-3 (b)(6)(B). The defendant will incur substantial, extraordinary, and continuing additional expenses for visitation. The best interests of the child CT Page 10108 require that funds be set aside to pay for expenses of visitation by the child and non-custodial parent to and from each other, for the defendant's increased child-related expenses during his extended parenting time, and for other means of preserving the parent-child bond. Accordingly, the court orders the defendant's child support payment reduced to $100 per week; in addition, the court orders that the defendant is not required to contribute to the cost of plaintiff's child-care expenses in Texas.
2. The defendant shall have liberal and reasonable rights of visitation, including but not limited to the following:
a. Until the minor child enters school (kindergarten or, if the child does not attend kindergarten, first grade), the child shall visit with his father in Connecticut for
(1) the second week of January, March, May, September, and November plus the previous and following weekends and
(2) half of the week between the day before Christmas and the day after New Year's (the parties alternating with whom Michael will spend Christmas eve and day). In 2002, Michael shall spend Christmas with his mother.
b. After Michael enters school (either kindergarten or first grade), he shall visit with his father in Connecticut during any vacation weeks of the school year from the Sunday before to the Saturday after; for every other Thanksgiving vacation; and for half of the week between the day before Christmas and the day after New Year's (the parties alternating with whom Michael will spend Christmas eve and day).
c. Six weeks in the summer.
d. Any weekends in Texas, upon two weeks written notice to the plaintiff.
e. The parties shall split the cost of Michael's travel expenses and ensure a suitable chaperon for his travel to and from Connecticut and Texas. Michael shall not fly by himself until both parents agree that he has reached the age and maturity that it is safe for him to do so.
3. The parties shall immediately explore the use of the internet for virtual visitation or online conferencing. Each party will be responsible for its own expenses in purchasing a computer and related hardware and software and obtaining and maintaining internet access. This court will retain jurisdiction over any motions or proceedings addressed to CT Page 10109 implementing this paragraph.
4. The court orders the parties to split the fees of the guardian ad litem, payable within 90 days of this date. The court denies the defendant's request for payment of his counsel fees by the plaintiff.
5. Both parties retain joint custody and shall continue to consult before any major, non-emergency decision is made regarding Michael's education, welfare, religion, or health. Whichever party is exercising parenting time will have authority to make decisions as to emergency medical, dental, or safety matters but shall immediately notify the other. The plaintiff may make day-to-day decisions about Michael's extracurricular activities and routine, non-major medical and dental treatment, but shall keep the defendant fully informed of those decisions and, where feasible, consult with him before making them. She shall provide Michael's schools, teachers, and leaders of extracurricular activities with the defendant's name and address and request that they forward to the defendant any materials provided to her; if she learns or believes that they are not doing so, she shall forward to the defendant within seven days of receipt copies of any reports, report cards, activity schedules, or similar information she receives.
BY THE COURT
FRAZZINI, J.